## THE AMOSKEAG MANUFACTURING COMPANY *vs.* GARNER and JOHNSON.

The fact that a manufacturing company, not engaged in making *prints* or *calicoes,* and having no trade-mark for them, has placed the name of the place where its mills are located, as a trade-mark, upon *cotton cloths* manufactured by it, does not prevent others from making use of the same local name to designate *printed goods,* or *calicoes* manufactured by them.

The doctrine of trade-marks is not capable of indefinite expansion; it should not be extended beyond its just limits.

Those who have made a name and reputation in trade or manufacture, by calling a given article by a particular name, should be protected, for to that extent it is their property; but if there is an article in the trade, or in the range of manufactures, to which it has not been applied, as to that article any one has a right to give it any name he may select; and if he selects a name which has been applied to some other article or thing, the owner of that article or thing has no right to complain.

The plaintiff, deriving its name from the "Amoskeag Falls," where its mills were located, was engaged in manufacturing cotton cloths, and it had been

Amoskeag Manufacturing Company *v.* Garner.

its invariable custom, for many years, to stamp or print its name upon goods of its manufacture, sometimes in full, as "Amoskeag Manufacturing Company," at others, "Amoskeag M. Co.," or "A. M. C.;" upon others, "Amoskeag," or "Amoskeag Cotton," or "Amoskeag Duck." The defendants used the word "Amoskeag" upon *printed goods*, or *calicoes*, manufactured by them. It appearing to the court, upon a motion to dissolve an injunction, that the plaintiff did not manufacture or sell print cloths, or calicoes, prior to the introduction of the labels by the defendants, and had no trade-mark or property in the word "Amoskeag," as applied to print cloths, or calicoes; that the defendants first applied that word to their prints and calicoes, and in so doing did not invade the plaintiff's right to use it, as to the goods it did make; that the defendants, in so applying the word to their prints, &c., did not intend to represent them as being of the plaintiff's manufacture, or to injure the plaintiffs or deceive the public; and that in fact the plaintiff had not been injured, nor the public misled or deceived; *Held* that the plaintiff was not entitled to an injunction to restrain the use of the word "Amoskeag" upon the prints and calicoes manufactured by the defendants.

*Held, also,* that the plaintiff could not be protected in the use of the word "Amoskeag," upon the ground that it was its name; but that it was entitled to protection in its use so far as it had applied the same to goods manufactured by it, and no farther.

That when it should appear that the plaintiff had applied the word, as its trade-mark, to *prints* and *calicoes*, before it was thus applied by the defendants, the defendants could be enjoined from using it; but that until that did appear, the use of the word by the defendants was lawful, and not an invasion of the plaintiff's rights of property.

A delay of nine years, in applying for an injunction to restrain the infringement of a trade-mark, is good cause for refusing it, or dissolving it if granted.

MOTION to dissolve an injunction restraining the use of a trade-mark.

The plaintiff, a New Hampshire corporation, alleged in its complaint, that it had been for thirty-seven years a large manufacturer of cotton cloths, and owned the Amoskeag Falls, where its mills were located; "that the word 'Amoskeag' is an Indian proper name given to the falls before mentioned by the aboriginies; that the plaintiff has always been known by that name; that *no other manufacturing establishment in the world* is known by that name; that the word 'Amoskeag' has not now, and never had, any general use or signification, except as applied to the

falls, and to the plaintiff's business." It also alleged that it had been "its invariable custom to stamp or print its name upon goods of its manufacture, sometimes in full, as 'Amoskeag Manufacturing Company;' at others, 'Amoskeag M. Co.' or 'A. M. C.;' upon others, 'Amoskeag,' followed by the name of the particular article intended to be designated, as 'Amoskeag cotton;' or 'Amoskeag Duck.'" It claimed that the distinctive word of its name is "Amoskeag;" and that it always appeared in full, or that it was indicated by its initial letter. The plaintiff alleged that the defendants used this mark or label upon *printed goods* or *calicoes* manufactured by the defendants. An injunction to restrain such use by them, having been granted by a judge of this court, the defendants now moved to dissolve it.

*L. R. Marsh, Wm. K. Thorn*, and *J. L. Ward*, for the motion.

*Evarts, Southmayd & Choate*, opposed.

GEO. G. BARNARD, J. (After stating and reviewing the facts.) Notwithstanding the mass of facts grouped together in the foregoing statement of the contents of the papers, it seems to me that none of the material questions of fact are much, if at all, in doubt.

The conviction is forced upon my mind, from the papers and the failure of the plaintiff to show specifically (for it must have it in its power so to do,) *when* it commenced manufacturing *print cloths*, that it in fact commenced their manufacture after the introduction by the defendants of the "Amoskeag prints" in the market. The defendants set forth clearly and with emphasis in their moving papers that they introduced this *print* at least nine years ago; indeed, Mr. Pinkham's affidavit shows that nine years ago they were openly and prominently introduced in Boston,

and that the plaintiff must have known of this; and numerous brokers, who have excellent opportunities for knowing, say that they never knew, nor heard of the plaintiff manufacturing print cloths; that they never bought or sold any; they express the belief that the plaintiff never manufactured any print cloths. The plaintiff answers this by the affidavit of Sterett, of this city, a member of the firm of Gardner, Brewer & Co., doing business here as agents of the plaintiff, that for *many years* last past the plaintiff manufactured print cloths, and he refers, as confirmatory of this statement, to a correspondence with a Philadelphia house in 1865. This is not-satisfactory. The plaintiff *knows* when it commenced the manufacture of print cloths; it had an opportunity to state it, and, failing to do so, when the fact is of great importance to it, the *presumption* is that it was after the introduction of the defendants' prints into the market that it commenced manufacturing *print cloths.*

Again, it is clear from the papers before me, that the plaintiff is not a *printer;* that, if it is conceded that it manufactures the fabric, it is indisputable that it does not *stamp* the devices, designs, figures and colors upon the cloth. It is equally clear that these labels do not represent the defendants as manufacturers of the fabric, but as printers; they represent that the defendants invent, contrive, and with their skill make and stamp upon standard fabrics the designs, figures and colors, which are upon the prints; that the process of making print cloths is one thing; that the defendants' process is radically and essentially a different thing; that the first process requires, as its foundation, raw cotton, machinery and labor of one kind and of a certain character; that the defendants' process takes any other manufacturer's standard goods, when finished by him as print cloths, and with *coloring material, chemicals, different machinery and different workmen, stamp and imprint* upon the standard fabric, colored figures,

Amoskeag Manufacturing Company *v.* Garner.

devices and characters; that the two processes are never carried on in the same factory, or by the same manufacturer as one branch of manufacture; that the manufacturers of print cloths, and of prints, throughout the country so understand it; that the trade so understand it; that the dealers in *prints* and *calicoes* never inquire as to the manufacturer of the fabric, but that they inquire simply as to the reputation, character and skill of the printer in producing fixed and fast colors—colors which will wear well, endure exposure to the air and sun, and stand washing; and that it would not make the slightest difference in the world to learn that the print or calico is the plaintiff's or any other manufacturer's make.

These conclusions are founded upon the statements of dealers in the trade throughout the country, by the most extensive manufacturers of fabrics, and by experienced printers, by brokers familiar with the manufacture of print cloths, and of prints and calicoes, and the plaintiff has wholly failed to answer them. It is no answer to these prominent, undisguised and unmistakable facts, to say that one man in Boston supposed he purchased the plaintiff's goods when he purchased "Amoskeag prints;" nor for one man in New York to say that it was believed and understood that the defendants intended to represent their goods as of the plaintiff's manufacture; nor for seven others to say that the labels are calculated to produce the impression that the prints or calicoes are manufactured by the plaintiff. These are not facts to be regarded as outweighing those presented by the defendants.

The plaintiff's counsel, in his third point, says: "But the plaintiff had never printed any of its cloths, and therefore had never used its name on any prints." This statement is in consonance with all the facts of the case; but, nevertheless, the plaintiff's counsel insists that, inasmuch as "the fabric and substance of the article is the same, the difference being in the coloring only," the de-

fendants have invaded the plaintiff's trade-mark. The plaintiff concedes that it has never manufactured *prints;* that it has never had a trade-mark for *prints;* that it has never placed its distinctive name of "Amoskeag" on *prints;* but because it has placed it on everything else in the shape of cotton goods except *prints*, it insists that it, only, has the right to put it there, and that if any one else, however honestly it may be done, places it there, he invades its trade-mark and must be enjoined. To this doctrine I cannot yield assent. I cannot subscribe to it; and, in my judgment, it is an unsound doctrine, and one which has not yet obtained, and never will obtain, a foot-hold in this or any other country where the principles of equity are intelligently applied and fairly administered. The plaintiff has the right to use this word as it used it prior to the use of the words employed by the defendants as their trade-mark, and any one who appropriates it to his use without the plaintiff's consent, invades its rights, must respond in damages, and will be enjoined. The plaintiff applied it to the great variety of goods manufac-tured by it, most clearly, except print cloths; and for the purposes of this case, I think it makes no difference whether it applied it to print cloths or not. When the defendants, manufacturing as they do print cloths, apply to them the word "Amoskeag," or call them "Amoskeag print cloths," it will be time enough to determine whether it is an invasion of the plaintiff's rights. It may be conceded that, to the goods of the plaintiff to which it applied this word, it became a trade-mark; that it was the sign, the ear-mark, by which the goods so labeled were known in the community; it was its advertisement, giv-ing character and reputation to the articles upon which it was thus stamped, and if the defendants have placed it upon goods such as the plaintiff has been in the habit of stamping it upon, it may be granted they have done the plaintiff an injury; that they have deceived and are de-

ceiving the community who are acquainted with the plaintiff's trade-mark. If the plaintiff placed this word upon *prints* or *calicoes* of its manufacture, as it has upon its ginghams, the defendants, by placing it upon their prints and calicoes, would invade its trade-mark, and should be enjoined. But they have done no such thing; and right here is the difficulty in the plaintiff's case, and which, in the end, must defeat this action. It never manufactured *prints* or *calicoes;* it never had a trade-mark for *prints* or *calicoes*, and consequently the defendants have not invaded any right of the plaintiff. I deny emphatically that the doctrine of trade-marks is capable of indefinite expansion; that when a word of meaning, a geographical word, is used as a trade-mark and first applied to one branch of manufacturing cotton goods, when there are subsequently invented several distinct branches to it, like Aaron's rod it swallows up all the subsequent branches. The doctrine of trade-marks must not be extended beyond its just limits; or, in a country like ours, filled as it is with enterprise, capital, skill, inventive genius, and with men possessed of progressive ideas, it will in the end be productive of greater injury than good. Protect those who have made a name and reputation in trade or manufacture, by calling a given article a given name, for to that extent it is their property; but if there is an article in the trade, or in the range of manufactures, to which it has not been applied, as to *that* article, any one has the right to give it any name he may select; and if he selects a name which has been applied to some other article or thing, the owner of that article or thing has no right to complain. It follows from these views that, as to prints, the plaintiff never had a trade-mark; that as to *prints* and *calicoes*, the defendants had the right to apply any word of significance, any word having a geographical meaning, not previously applied to those articles; and when they selected a word applied by the plaintiff to goods other than prints,

no rights of the plaintiff were invaded, although the word forms a part of the plaintiff's corporate name; any other rule would be impracticable.

The plaintiff, for over thirty-seven years, has manufactured almost every conceivable cotton fabric; to these it has applied this word in a variety of ways, but it never manufactured *prints;* it never applied it to *prints;* it could have done so if it had desired to, but it did not, and does not; it says it will not do it itself, nor will it permit others to do it. This is a sort of dog-in-the-manger policy, which courts of equity will not enforce. Corporations and vast monopolies must be protected in their legal and well ascertained rights, but it is not incumbent upon courts of equity to prevent others from doing what corporations and monopolies have failed to do, and do not do, simply because they prefer not to do it.

I have examined the cases cited by the plaintiff's counsel, and many others, and no case—no principle established by any reported case which has fallen under my observation—sustains the plaintiff's views.

The counsel for the plaintiff says the distinction between the print cloths and prints, as applied to the entire class of cotton goods, is a distinction without a difference. In this proposition I think the plaintiff's radical error exists. As I have before remarked, with the light thrown upon the distinction by the testimony of manufacturers of print cloths and of prints, by the testimony of cloth brokers, traders and merchants, the difference is as wide as that between day and night. The distinction is as great as that which exists between the *raw cotton* and *print cloths;* for print cloths, after all, are cotton: the distinction is as great as that between the rough, unhewn marble, and the same marble after passing through the hands of skill and art, for sculptured art is marble still; it is as great as the distinction between the canvas

before and after genius and skill have placed upon it their creations; it is as great as the difference between crude brass before and after it has passed through the hands of the " cunning workman;" indeed, these examples might be multiplied without number. A certain kind of skill produces the raw cotton, a higher degree of skill produces the *print cloth;* a still higher, and indeed the highest degree of skill, produces the print—the calico; each is a distinct process, each requires a peculiar process, not applicable to the other. The raw cotton manufacturer may have his trade-mark, and undoubtedly in many instances has it. The print cloth manufacturer may have his, and so may the print manufacturer. Suppose the print manufacturer adopts the raw cotton trade-mark word, or *vice versa*, or that the print cloth manufacturer adopts the raw cotton trade-mark, would an injunction be issued for the invasion of a trade-mark in either case ?

The argument of the plaintiff is, that the distinction between print cloths and prints·is for manufacturers and experts; that they neither know or care for the difference in the mode of coloring them; good cotton stuff of good color is the thing needed.

Certainly this argument shows that the trade cannot be misled, and it is difficult to see how the masses who use *calicoes* can be. They never use *print cloth*, as I understand it, until after it has been printed; and thus it will be impossible for the masses who use prints or calicoes to know anything of *print cloths*. This is the first inference from the papers before me; but I think the intelligence of those who use prints, calicoes and ginghams, &c., is underrated. I have exhibited the specimens of prints and ginghams submitted, to the humblest servant women, and they at once declare their preference for the print, and show a perfect familiarity both with the print and gingham. It is clear that the trade is not deceived, and I think it is equally clear that the masses are

not; that the consumers and small dealers are not. When the pertinent fact is borne in mind, that the plaintiff has never manufactured or sold *calicoes*, it will be impossible to come to the conclusion that those who have never used them or seen them, or ever heard of them as of the plaintiff's manufacture, can be induced to purchase the defendants' calicoes because the word "Amoskeag" is upon them. The plaintiff never had any name or reputation, good or bad, for producing *calicoes;* it has a good name as a manufacturer of other goods, and when the defendants shall use the word "Amoskeag" upon goods manufactured and sold by the plaintiff, they will do it an injury, may deceive the public, and will be enjoined. But as it is, the plaintiff is not injured; its sales of prints cannot be lessened or injured, for it never sold or manufactured any; its sale or manufacture of goods other than prints cannot be injured by the defendants' conduct, because, as to such goods, the defendants do not apply the word "Amoskeag." These views, if sound, are also fatal to the plaintiff's case, because all the authorities agree that the plaintiff must be injured by the invasion of its trade-mark, and that the public must be deceived or imposed upon. Besides, this court will not aid a party when, by so doing, it works wrong and oppression.

In this case it is apparent that the defendants' labels have been well known in the markets of the country, from Boston to St. Louis, for years; in the former market, near the plaintiff's place of manufacture, for at least nine years. I am well satisfied that the plaintiff was aware of these labels long ago; indeed it nowhere says to the contrary; it must therefore be regarded as having winked at—connived at—the use of this word; it may have supposed it could not in the end injure it; that it could, when it saw fit, enjoin the defendants, and thus prevent the continuance of the use of it *by them;* the defendants have gone on for years, confessedly their right to do so

unquestioned, notwithstanding one of the plaintiff's affidavits says it was understood and believed in New York that the label was employed to produce the *impression that the prints were manufactured by the plaintiff*, and that was nine years ago; they have built up by degrees, and by their skill, enterprise and capital, a good name and reputation for these prints; their sales are large; their damage, by reason of this injunction, being $3000 a day; the plaintiff, after thus lying by, suddenly, when the leading member of the defendants' firm is compelled to pay a sum of money larger than the plaintiff's capital of three million dollars, discovers that its trade-mark has been invaded, its good name for manufacturing everything besides *prints* has been invaded, and it and the public injured by the defendants manufacturing and selling what the plaintiff never manufactured or sold—prints, calicoes. If the plaintiff's views can be sustained, a great injury and wrong certainly will be done in the name of law and equity; the defendants will be enjoined, and their trademark and valuable trade secured by their invention, as represented by these labels, will be destroyed. It will be blotted out. Or shall the plaintiff succeed to it? Shall it secure it? The strong arm of equity is never stretched forth and employed, not only to work wrong and oppression, but to enable a party to obtain a dishonest, unconscientious advantage, by appropriating to himself the fruits of another's industry, skill and capital. The plaintiff does not manufacture prints; if the injunction stands, the defendants cannot manufacture or sell prints with these labels upon them; to fill the void thus created, the plaintiff claims it may, for the first time, manufacture the prints or calicoes, imprint upon them "Amoskeag Prints," take them into the markets of the country, and sell them upon the strength and reputation which the defendants' prints have acquired. And the plaintiff claims that this

it shall be enabled to do through the intervention of a court of equity. When such results can be produced in a civil tribunal, organized by the laws, and in conformity to the constitution, it deserves to be called by some other name than a court of law or a court of equity.

Frankness constrains me to say I am unfavorably impressed by the plaintiff's course in selecting the time it did for obtaining and serving its injunction. The defendant Garner states facts and circumstances, and charges an intent on the part of the plaintiff, calling upon it to deny that it designed by these proceedings to embarrass them, financially, by arresting their business immediately after being compelled to pay out a sum of money larger than the plaintiff's capital of three millions; and how does it deny it? By producing the affidavit of a mere agent of the plaintiff, Sterett. It would have been much more satisfactory to have had an affidavit, at least from the treasurer, verifying the complaint.

If it is necessary, to maintain an injunction, for the plaintiff to establish an intent on the part of the defendants to defraud the plaintiff, or to deceive the public, (and I do not mean to express an opinion upon this subject, although many authorities seem to hold that it is,) I think that it has entirely failed to do so. The defendants, when they introduced these prints, in the light of the evidence before me, knew that the plaintiff did not manufacture print cloth; they knew that the plaintiff had never manufactured prints or calicoes; consequently, they knew that the plaintiff had no reputation, good or bad, as to prints or calicoes; they knew that the trader or the consumer never, in purchasing calicoes, inquired after the manufacturer of the fabric, any more than they inquired after the raw cotton out of which the print cloth was made; they knew that standard print cloths were all that were necessary to make desirable prints; that the character of the print depended, with the trade and with the

consumer, upon the skill and reputation of the printer for producing superior devices, designs, figures and *fast colors;* they well knew that their prints must stand or fall, as they produced, or failed to produce, *fast colors:* knowing these things, they undertook the enterprise of adding another name to the already long list of names upon their labels; they had already some names other than Indian names; they had already several Indian names; they added "Amoskeag Prints" to the list to designate another grade of prints; the fabric of these prints contained sixty threads by sixty-four threads to an inch; after a while they concluded to improve the fabric by substituting "standard," containing sixty-four threads by sixty-four threads to an inch; they also improved the colors, and when thus really improved in *fabric* and *coloring*, they *truthfully* called it "Amoskeag Improved;" they introduced it to the trade as their production; the trade so understood it, almost universally, except a single Boston merchant. They selected this word, as the defendant Garner says, for the simple purpose of designating this class of prints from some thirty other varieties, as he selected the other Indian names; that the word has a proper significance as applied to manufacturers, and that it is a fair sounding name. The conclusion is irresistible, it seems to me, that the defendants acted in the best of faith in selecting this word; that they could not, and did not, and do not injure the plaintiff, or deceive the public; that the trade well understood, (as well as the public generally, so far as they have knowledge upon these subjects,) that the prints and calicoes were of Garner & Co.'s production; indeed, I am satisfied, from the whole case, that the plaintiff so understood it, at all events until very recently; otherwise, it is impossible to account for its long silence, and for its toleration of what it now claims to be an invasion, a piracy of its trade-mark, to its great damage.

Amoskeag Manufacturing Company *v.* Garner.

My conclusions are:

1. That the plaintiff did not manufacture print cloths prior to the introduction of the labels by the defendants.

2. That it never manufactured or sold prints or calicoes.

3. That it had no trade-mark or property in the word "Amoskeag," as applied to *prints* or *calicoes.*

4. That the arts of manufacturing print cloths, and prints and calicoes, are essentially distinct and different as to *material,* machinery, factory, neatness or the *reverse, skill* and *workmanship.*

5. That the trade generally, and the consumer, in purchasing *prints* or *calicoes,* never take into account, in the slighest degree, the manufacturer or the place of manufacturing the fabric or print cloth.

6. That the sole inquiry made by the trade, generally, and by the consumer, in purchasing prints or calicoes, is as to the character and reputation of the printer's skill in producing *desirable* and *fast colors.*

7. That the trade generally, as well as consumers, well know and understand the difference between *prints* or *calicoes,* and *ginghams,* &c.

8. That the defendants first applied the word "Amoskeag" to their prints and calicoes, and that in so doing they did not invade the plaintiff's right to use it as to its goods, as it always had used it.

9. That the defendants, in so applying that word to their prints, did not intend to represent their calicoes as of the plaintiff's manufacture.

10. That in so applying it they did not *intend* to injure the plaintiff, nor to deceive the public, and that, in fact, the plaintiff *has not been injured,* nor has the *public* been *misled* or *deceived.*

11. That the sole and only object and design of the defendants in using the word and devices upon their labels

Amoskeag Manufacturing Company *v.* Garner.

was, and is, to distingush *these calicoes* from other grades and varieties manufactured and sold by them.

12. That the trade so understood it; that the consumers so regarded it, as well as the plaintiff.

13. That these prints were introduced into the markets of the country, and particularly into the Boston market, more than nine years ago, to all the trade, as Garner & Co.'s productions; that the trade throughout the country so understood it, as well as consumers; and the conclusion that the plaintiff so understood it is irresistible from the indisputable facts before me.

14. That these prints have acquired, through the skill, industry and capital of the defendants, a high reputation in the markets of the country; that the plaintiff, well knowing these facts, never questioned, in any way or manner, the right of the defendants to use the word "Amoskeag," and by its silence consented to, if it did not encourage, the defendants in the use of this word upon their labels introducing these prints to the trade generally throughout the country.

15. That, under these circumstances, to deprive the defendants of the use of these labels will work to them great and irreparable injury, wrong and hardship, and at the same time give to the plaintiff a dishonest and unconscientious advantage as the fruits of the plaintiff's own wrong and negligence. The rule is, that the plaintiff must not be guilty of any improper delay in applying for relief. (*Hilliard on Inj.* 34, § 43. *Gray* v. *Ohio, &c.,* 1 *Grant,* 412. *Wood* v. *Sutcliffe,* 2 *Sim.* [*N. S.*] 168.) If a party will lie by and be guilty of laches in the enforcement of his rights, he thereby in many cases forfeits his rights to the relief by injunction. (*Tash* v. *Adams,* 10 *Cush.* 253. *Binney's case,* 2 *Bland,* 90. *Sheldon* v. *Rockwell,* 9 *Wis. Rep.* 166.) In *Lewis* v. *Chapman* (3 *Beav.* 133) a delay of six years and a half was the only ground assigned for refusing an injunction to restrain the piracy of a publica-

tion, when the plaintiff's rights were admitted but for the delay. (*And see Saunders* v. *Smith,* 3 *Myl. & K.* 711; *Smith* v. *Adams,* 6 *Paige,* 443; *Cooters* v. *Hunter,* 4 *Rand.* 58.)

16. That the design and object of the plaintiff in enjoining the defendants, at this particular time, from using these labels, was, and is, to produce financial embarrassment to them, by destroying their profitable trade, immediately after the payment by the leading member of the defendants' firm, in pursuance of the terms of his father's will, of the sum of $3,225,000.

17. That to uphold the injunction upon the papers before me, would be grossly inequitable and unjust to the defendants, would enable the plaintiff to profit largely by its own wrong and negligence, and will thus turn this court into an engine to oppress and destroy, when its true office is to relieve a party from hardship and oppression, and to protect him in the enjoyment of his rights, when they are illegally and wrongfully invaded or threatened with injury.

18. That as to these *prints* or *calicoes,* the labels are the defendants' *trade-mark* and *property,* and whoever invades them does an injury to the defendants' rights of property; they are the defendants' property, and trade-marks as to these *prints,* to the same extent that the word "Amoskeag" is the plaintiff's trade-mark and property when applied to goods of the plaintiff's manufacture.

19. That the plaintiff cannot be protected in the use of the word "Amoskeag" upon the ground that it is its name, or part of its name, but it can and must be protected in its use so far as it has applied it to goods manufactured by it, and no farther; and when it shall appear that it has applied it as its trade-mark to *prints* and *calicoes,* before it was thus applied by the defendants, the defendants can be, and must be, enjoined from using it; but until this does appear, the use of the word by the defendants is lawful; it is not an invasion of the plaintiff's rights of property,

Amoskeag Manufacturing Company *v.* Garner.

and they cannot be enjoined. The following cases and authorities sustain these views: *Fetridge* v. *Wells,* (13 *How. Pr.* 385;) *Howe* v. *Searing,* (19 *id.* 14;) *McCardel* v. *Peck,* 28 *id.* 123;) *Edelsten* v. *Edelsten,* (1 *De Gex, J. & S.,* 185;) *Hall* v. *Burrows,* (10 *Jur. N. S.* 55 *Ch.; S. C.,* 9 *Jur.* 483;) *Amoskeag Manufg. Co.* v. *Spear,* (2 *Sandf.* 599, 607;) *Brooklyn White Lead Co.* v. *Masury,* (25 *Barb.* 416;) *Blofield* v. *Payne,* (4 *Barn. & Adol.* 410;) *Crawshay* v. *Thompson,* (4 *Mann. & Gr.* 357;) *Croft* v. *Day,* (7 *Beav.* 84;) *Millington* v. *Fox,* (3 *Myl. & C.* 338;) *Corwin* v. *Daly,* (7 *Bosw.* 222;) *Bininger* v. *Wattels,* (28 *How. Pr.* 206;) *Burnett* v. *Phalon,* (9 *Bosw.* 192.) These are cases upon the subject of trademark, and sustain my views as expressed above.

20. That it will be inequitable and unjust to continue the injunction, and the plaintiff has been guilty of laches. (*See* 2 *Story's Eq. Jur.* § 959, *a; Hilliard on Inj.* §§ 17–43; *Lewis* v. *Chapman,* 3 *Beav.* 133; *Gray* v. *Ohio,* 1 *Grant,* 412.) The injunction was, undoubtedly, properly granted by CARDOZO, J., upon the complaint and affidavits presented to him. Indeed, it was his imperative duty, upon those papers, to grant it, as it is mine, from the whole case, as it now appears, to dissolve it.

Injunction dissolved, with costs.

[NEW YORK SPECIAL TERM, May 3, 1869.  *Geo. G. Barnard,* Justice.]