### PRINCE MANUF'G CO. *v.* PRINCE'S METALLIC PAINT CO.

*(Supreme Court, General Term, First Department.   June 26, 1891.)*

1. TRADE-MARKS—TRANSFER—INCIDENT TO PROPERTY.

   One Prince was engaged in the manufacture of paint from iron ore obtained from land owned by him. After his death the land, together with the right to manufacture the paint and to use his trade-marks, was acquired through intermediate conveyances by defendant corporation, and the business was continued by it. Afterwards all of defendant's property (land, buildings, etc.) was sold with the "improvements," under a mortgage theretofore executed by defendant. Part of the land, including the buildings, was purchased by plaintiff, a corporation engaged in manufacturing a similar kind of paint, and the residue of the land was purchased by a third person, and leased to plaintiff. The land so acquired by plaintiff was valuable in that it contained the ore used in the manufacture of paint, and the improvements on the land were adapted only to such use, and were so used at all times. After plaintiff had acquired the property theretofore owned by defendant and used in the paint manufacture, defendant's president gave plaintiff an order for "all trade-marks, and wood-cuts and electrotypes of the trade-marks," which were delivered accordingly. These trade-marks had been used exclusively by each successive proprietor of the property to designate the manufactured product. *Held*, that it was the intention of the parties that the exclusive right to such trade-marks should pass with the property as an incident thereto, and that plaintiff was entitled to the exclusive use of the same.

2. SAME—SALE UNDER EXECUTION.

   An allegation in a complaint to restrain the use of a trade-mark which was formerly the property of defendant, a Pennsylvania corporation, that plaintiff had by purchase obtained all the right and title to the exclusive use of the trade-mark, is broad enough to authorize the admission of evidence that the trade-mark had been sold under execution against defendant, (as authorized by the Pennsylvania statutes,) and had by intermediate sales been acquired by plaintiff.

3. SAME—IRREGULARITIES.

   The statutes of Pennsylvania provide that trade-marks may be sold under execution, but declare that such sale shall be made on an *alias* writ, after the return of a preceding writ unsatisfied. *Held*, that where a trade-mark was sold under an execution which recited that it was made "again," and it appears that a former writ was issued on the same judgment, it sufficiently appears that such statutes were complied with; the omission of the writ to follow the language of the statutes being no more than irregularity.

Appeal from special term, New York county.

Action by the Prince Manufacturing Company against Prince's Metallic Paint Company. The complaint was dismissed, and plaintiff appeals. For former report, see 4 N. Y. Supp. 348, 349.

Argued before VAN BRUNT, P. J., and LAWRENCE and DANIELS, JJ.

*Dillaway, Davenport & Leeds, (F. S. Coudert,* of counsel,) for appellant..
*John Frankenheimer, (Joseph H. Choate,* of counsel,) for respondent.

DANIELS, J.   The object of this action was the procurement of an injunction restraining the defendant from using the designation, name, or trademark of "Prince's Metallic Paint." It was first employed in or about the year 1858, as the name of a paint manufactured from a metallic iron ore discovered by Robert Prince in land owned by his wife, Antoinette Prince, and situated in Carbon county, in the state of Pennsylvania. She died in 1859, leaving a will by which she nominated her husband and her son David Prince the executors of her estate, and empowered them to sell her real estate. After her decease the business was continued with ore extracted from the same property at the mill which had been erected for that object near to, but not upon, the same land, until the decease of Robert Prince, in 1870. In the mean time Albert R. Bass, a son-in-law of Robert and Antoinette Prince, had acquired an equal undivided half interest in the land, and also in the business; and on the 21st of January, 1871, David Prince, for himself, and also as surviving executor, entered into a co-partnership with Albert R. Bass and Mary M., his wife, to manufacture Prince's metallic paint from ore produced from the property owned by them in Carbon county, for the period of five years. This partnership was formed by an agreement in writing, and it contained the recital, "said paint and trade-mark being owned and controlled by the parties of the first and second part." The business was continued under this agreement until the fall of 1871, when David Prince, individually and as executor, sold out his interest in it to his partner Albert R. Bass. The latter, with his associates, soon afterwards took measures for the formation of a corporation under the name of "Prince's Metallic Paint Company," but then not in fact consummated; and in 1875 other proceedings taken for the same purpose were completed, and the corporation was brought into existence. This corporation succeeded to all the rights and interests of Albert R. Bass in the business, and the undivided one-half of the land previously obtained by him; and Abraham C. Prince, another son of Antoinette Prince, entered into the employment of the corporation, but he soon afterwards left it, and with his brother David Prince formed the firm of Prince Bros., who carried on the business of manufacturing and selling metallic paint from similar ore obtained in the same county from lands at or near Bowmansville. Their paint was sold as "Prince Brothers' Iron Ore Paint;" and the effect of their competition in the business was to bring the Prince Metallic Paint Company into a practical condition of insolvency, and deprive it of the ability to continue business or pay its debts. In the course of the business under the name of "Prince Metallic Paint Company" the original mill used and maintained by Robert Prince had been abandoned, and devoted to a different business, and other metallic paint property had been obtained, where a larger mill had been erected, at which the business of the company was principally, if not wholly, carried on. But in the purchase of this additional property, as well as in the purchase of the undivided one-half of the original land from which the ore had been first obtained, mortgages had been given, and their non-payment led to their foreclosure, and sales of the property mortgaged. The mortgage on the undivided half of the land from which the ore was first obtained was given by Albert R. Bass to David Prince, as executor, on the 6th of January, 1872, and by the deed on the foreclosure sale of that mortgage the same undivided interest was conveyed to Henry Lovejoy on the 27th of August, 1878. The mortgage upon the premises purchased by the Prince Metallic Paint Company, and upon which its mill had been erected, was given on the 11th day of January, 1878, and that was conveyed by the deed on the foreclosure sale to John Balliott and Charles Meendson. By these foreclosures and sales the Prince Metallic Paint Company appears to have been de-

prived of all the property from which its business had been carried on. During the partnership of Albert R. Bass and David Prince, and afterwards, when the business was that of Bass alone, and also while it was under the name of the Prince Metallic Paint Company, the same label was used and attached to the packages containing the paint manufactured by each as had been used by Robert Prince, the first manufacturers designating it "Prince's Metallic Paint." The right to make this use of the label was not questioned by any member of the Prince family; but the evidence of David Prince was that it was used after he left the copartnership business by his permission, and not by any transfer of that right to Albert R. Bass. Without determining whether this evidence should be followed as entirely correct, it will be sufficient to say that until the Prince Metallic Paint Company ceased to do business this use of the label received the sanction of the Prince family.

While the business and property was in the situation already described, and on the 27th of April, 1879, the plaintiff was created a corporation for the purpose of mining and manufacturing metallic paint. Five out of the eight incorporators were members of the Prince family, including Abraham C. and David, who were the firm of Prince Bros. The corporation was formed under the laws of the state of Pennsylvania. The premises conveyed by the sheriff on the foreclosure sale made of the property on which the new mill was erected and maintained, were conveyed by the purchasers, Balliott and Meendson, to Sadie and Lizzie Prince, on the 20th of December, 1878, and by them to Henry Lovejoy on the 29th of March, 1879, and by him, together with the undivided one-half of the land on which the metallic paint ore was first found by Robert Prince, to the plaintiff, on the 10th of May in the same year. These deeds, as well as the mortgages, described the lands alone which were incumbered or conveyed respectively by them, except that the deed executed by David Prince, executor, to Albert R. Bass, did also contain the clause, "together with the buildings and improvements," and the mortgage made by the Prince Metallic Paint Company to Heidlinger added the word "improvements." And under them the plaintiff asserted the right to use and attach to its manufacture the label or trade-mark describing that as "Prince's Metallic Paint." It does not become necessary to decide whether under these conveyances alone that right was obtained by the plaintiff, for such also appears to have been the understanding which, as a matter of fact, at the time prevailed; for A. R. Bass & Co. on the 10th of January, 1870, gave an order on Mr. Phair, whom it is to be presumed had some charge of a department of this business, as he was the printer, to deliver to the plaintiff "all trade-marks, and wood-cuts and electrotypes of the trade-marks,— 'Prince's Metallic Paint,' 'Prince's Iron Paint,' and 'Eagle Metallic Paint.'" Mr. Bass is stated at that time to have been the president of the Prince Metallic Paint Company, whose property was obtained by the plaintiff. Abraham C. Prince testified that he called upon him for the order, and, after obtaining it, added: "And after that we got the cuts; the cuts were delivered to me; I supposed that was all of them." And while this witness was contradicted by affidavits he had made in other suits on other subjects, this evidence appears to be entirely reliable, fortified as it is by the order, and in its freedom from contradiction. In the same manner the fact was brought into the case that a sign had been placed by Mr. Bass on the new mill, erected about 14 years before the trial, giving it the name, "Prince's Metallic Paint Works;" and that has been maintained on the top of the building since that time. In a word, the land itself was useful and valuable by reason of the fact that it contained this mineral deposit in profitable, as well as accessible, quantities; and the improvements made upon and in its vicinity were adapted alone to obtaining, grinding, and manufacturing these deposits into metallic paint. They were at all times in that manner used and employed, and the business done consisted in that use, and the sale of the paint; and with that

business, through all its changes in proprietorship, this label or trade-mark had been used to designate and accompany the manufacture. There was no divided use of it, neither was the right denied; but it was in fact conceded by the Prince Bros. that it should accompany the product, as it did, which was manufactured. These facts, with the sign upon the mill, and the order for wood-cuts, trade-marks, and electrotypes, are consistent with no other theory than that it was the design and understanding of the parties that the right to the label or trade-mark not only should, but in fact did, go with the property. The facts supporting the conclusion that the label or trade-mark was intended to and did pass as an incident to the property itself are certainly as cogent as they were in *Congress, etc., Spring Co.* v. *High Rock, etc., Co.,* 45 N. Y. 291; and there it was held that by purchasing the property supplying the water, with the right to proceed with the business, the plaintiff acquired the right to the trade-mark "to designate the article upon which this business was carried on." Id. 302. And it is further sustained by *Booth* v. *Jarrett,* 52 How. Pr. 169; *Kidd* v. *Johnson,* 100 U. S. 617; *Pepper* v. *Labrot,* 8 Fed. Rep. 29, and *Milling Co.* v. *Robinson,* 20 Fed. Rep. 217. And the principle has not been rendered inapplicable by the fact that Seton Heather in June, 1879, obtained the title to the other undivided half of the land from which the mineral was first obtained by a deed on another foreclosure sale, made under a mortgage given to him by Albert R. Bass, for Heather at no time appears to have made any claim whatever in conflict with the plaintiff's right to use this label or trade-mark, and conferred no right on the defendant, which first came into existence as a corporation, under the laws of Pennsylvania, on or about the 17th of April, 1888, to make that claim; and Heather in fact surrendered his right to all interference of that description by leasing his undivided half to the plaintiff, for the period of 21 years, on the 20th of July, 1888, which was shortly after the commencement of this action. From all that appears by the case, not very clearly or artistically set forth, it may be added, the conclusion is well supported that the plaintiff did, soon after its incorporation, acquire the right to use and employ the label or trade-mark in controversy to designate and accompany the packages containing its product.

It was also further proved that under a statute of the state of Pennsylvania, in lieu of proceedings to sequestrate the property of corporations, the "personal, mixed, or real property, franchises and rights of such corporation," may be levied upon and sold, under a *fieri facias* commanding the sheriff or other officer to make the levy, to satisfy the judgment upon which the writ is issued; and in October, 1879, a writ of *fieri facias* was issued against the Prince Metallic Paint Company upon a judgment recovered against it by Charles Meendson, by virtue of which the sheriff levied upon, advertised, and sold this label or trade-mark to the plaintiff in the execution. He immediately after the sale assigned and transferred his right, title, and interest in the trade-mark to A. C. and Robert Prince, agents. How the plaintiff obtained the title of these assignees, if they really had any, has not been clearly shown, but in an assignment from Lizzie and Sadie Prince to Henry Lovejoy of the same trade-mark it is recited that it was assigned to them by Meendson on the 23d of November, 1878, which is the same date as the assignment from Meendson to A. C. and Robert Prince; and Lovejoy, on the day on which he received his assignment, made another of this label or trade-mark to the plaintiff. In this manner, or by the co-operation of A. C. and Robert Prince in the organization of the plaintiff, or both, the label or trade-mark was in form certainly transferred to the plaintiff. It is not very important to critically consider through which process the transfer was made, nor what right may have been obtained by Lizzie and Sadie Prince under a like assignment made to them by David Prince, executor, for the objections which have been raised to the title of the plaintiff do not depend upon any defect in the forms resorted to for its transmission, but they are made to the levy and sale

under the writ of *fieri facias*, and the condition of the complaint.   That is objected to as not permitting evidence of these proceedings; but that objection was not made upon the trial, where it might have been removed by an amendment, if it had been well founded.   Besides that, the complaint contains the allegation that the plaintiff had by purchase obtained all the right and title to the trade and custom of the paint-works, and to the use of the trade-mark exclusively, and to the name of Prince, which was sufficiently broad and direct to permit any evidence to be received, tending to prove the fact alleged.   It is very probably true, as it was stated by the witness Selcer, who was counsel for and a director of the Prince Metallic Paint Company, that under the general law of Pennsylvania a label or trade-mark could not be sold under an execution; but when he gave testimony indicating that such a sale could not be made under the statute of Pennsylvania, or disconnected with other corporate property, he was very clearly in error, for the statute has by its own language authorized a levy and sale of any of the property, franchises, and rights of the corporation, and when this levy and sale took place, this label or trade-mark was all that was left of the property of the Prince Metallic Paint Company.   That was property, and as the execution had been substituted for the ordinary proceedings of sequestration, and was designed to devote all the corporate property to the satisfaction of the creditors' judgment, it must have been intended that this could be sold under its authority; and as a sale was authorized, and could only be made to some person as purchaser, and that person was neither defined, nor in any manner subjected to any qualification or restriction, it is equally evident that any person was authorized to buy, although the label or trade-mark was still to be restricted to the manufacture of Prince's metallic paint.   It was a species of property which the statute made vendible and purchasable under the execution, and afterwards transferrable by the purchaser, as this was indirectly to the plaintiff.   The fallacy of this objection is also conspicuously exhibited by the fact that the defendant's title to the label or trade-mark depends wholly upon another sale made of it under other judgments in February, 1888.

By another statute of the state of Pennsylvania it was requisite that a preceding writ should have been returned wholly or partially unsatisfied, and that the sale of interests of this description should be by an *alias* writ.   But that was substantially complied with by the writ issued on the 19th of December, 1877.   It was upon the same judgment, and may now be presumed to have been returned in part, at least, unsatisfied; for without that return the second writ would have been irregular, and that is not to be assumed without some evidence warranting the presumption, and the case has supplied no such evidence.   Beyond that, the writ under which the levy and sale took place was an *alias* writ.   That is shown by its command to the sheriff reciting that it is made "again."   It may have been defective in point of brevity, but still its intent was evident, and it was obeyed by the officer.   In one respect the writ was defective,—that is in not directing the sheriff to satisfy the judgment by a levy upon and sale of the franchises and rights of the corporation; but it still did, as a matter of fact, include this label or trade-mark.   It was property, and, in the enlarged signification of the term, a chattel, and within the direction of the execution.   The omission literally to follow the language of the statute was therefore, at most, no more than an irregularity.   The power to sell was provided, and it was to be executed by a writ of *fieri facias;* and that was done in this instance.   There was no such departure in the recital made or the command given as rendered the proceeding void, though it was voidable on motion, and might have been vacated, as that was done for want of a preceding execution in *Fox* v. *Railroad Co.,* 8 Phila. 639.   An irregularity in practice is stated to consist in the want of adherence to some prescribed rule or mode of proceeding, either in omitting to do something that is necessary for the due and orderly conducting of a

suit, or doing it in an unseasonable time or an improper manner. 1 Burrill, Pr. (2d Ed.) 470, following 1 Tidd, Pr. 512, 516. But, as already stated, that does not render the proceeding it affects void, but only voidable; and, unless it be avoided by motion diligently made, the objection will be waived. 1 Burrill, Pr. 472–474. And this practice is supported by *Lusk's Appeal*, 108 Pa. St. 152, although that case differs from the present in the fact that the irregular sale had been confirmed; but that circumstance can be of no paramount importance after the long lapse of time intervening in this case, and no application having been made, within the time allotted for that purpose, for an order vacating this sale. For nearly nine years the plaintiff used this label or trade-mark without any question, protest, or denial of its right on the part of the Prince Metallic Paint Company, which continued its organization until the defendant, as its successor, came into existence. Its officers were undoubtedly aware of the fact that the plaintiff claimed and used as its own this label or trade-mark. Mr. Bass, its president, understood when he gave the order for the trade-marks, wood-cuts, and electrotypes that such was the object in obtaining it; and when the sale of the trade-mark and franchises of the Prince Metallic Paint Company was made the second time under execution, early in 1888, it was altogether too late to gainsay the title of the plaintiff, even if that were irregularly obtained under the execution sale which took place in November, 1879, for the irregularity has been rectified by time. The attempted transfer by assignment from the Prince Metallic Paint Company to Albert R. Bass, and by himself and wife and that company to the plaintiff, do not require special examination. They are certainly at least of doubtful import. The transfer by the company was not authorized by the board of directors, and it was in violation of its by-laws. Both objections to these instruments, and still another later document in their confirmation, seem well founded, and so they were held to be at the trial. *People's Bank* v. *St. Anthony's Church*, 39 Hun, 498, affirmed 109 N. Y. 512, 17 N. E. Rep. 408; *Munson* v. *Railroad Co.*, 103 N. Y. 58, 73, 74, 8 N. E. Rep. 355. And the case of *Edgerly* v. *Emerson*, 3 Fost. (N. H.) 555, is entirely consistent with these authorities.

The fact that the label or trade-mark has been devoted by the plaintiff to metallic paint manufactured at the new mill from ore obtained from the land where it is located, and from leased lands in the same vicinity, and to paint manufactured at another mill from leased lands near it, and without any addition of ore obtained from the 40 acres owned by Antoinette Prince in her life-time, was not considered a ground for dismissing the complaint; neither could it be, for the witnesses agreed in the main that the paint produced from these ores was as good in quality and color as that made wholly or partly from the ore obtained on the tract where it was first found. It is true that this evidence did conflict with statements contained in affidavits made in other litigations by Abraham C. Prince; and if the fact stood alone on his testimony these contradictions would lead to its overthrow. But it does not. Adolph Reich, who was sworn for the defendant, testified: "I think there is no difference at all between the ore from the Prince tract and the others." Klein, also for the defendant, expressed himself very much in the same way, adding: "I say some is darker. It all makes the same paint. I mean that the ore taken from all the mines along that vein, ten or twelve miles, makes the same paint, if it is kept clean, just as good as mine." The plaintiff's witness Stroup pronounced the same judgment; and so in effect was the final conclusion of Abraham C. Prince. In this state of the facts it is quite evident that there was no deception or misrepresentation in labeling the paint manufactured by the plaintiff, "Prince's Metallic Paint." The designation was consistent and truthful. It was applied to the same article, manufactured from the same material and by the same process, as that also had been done by Mr. Bass himself and the first Prince Metallic Paint Company. The

.action, therefore, is not affected by anything said or decided in *New York, etc., Card Co.* v. *Union, etc., Co.,* 39 Hun, 611, or *Koehler* v. *Sanders,* 122 N. Y. 65, 25 N. E. Rep. 235, or either of the other authorities cited by the .defendant's counsel.   There seems to be no authority for the position that the plaintiff should in its use have stated itself to have been an assignee of the label or trade-mark, as it was both appropriately and truthfully employed in ·the business which it carried on.   The same use had been made of it ever ·since the decease of Robert Prince, and no sufficient reason now appears for .denying it to the plaintiff.   The plaintiff has maintained an office at 71 Maiden lane for the transaction of its New York business, in which city metallic paint has been mostly sold, and the defendant has now located itself, under ·the name of "Prince's Metallic Paint Company," at 77 on the same street. The object is entirely apparent.   It is to divert to itself the plaintiff's trade, .and that is a fraud which the law does not countenance, so long as it violates ·the plaintiff's right.   There is such a violation, for the defendant applies to its manufacture of metallic paint the same label or trade-mark that the plaintiff not only used, but acquired the right to use as it does, many years before ·the defendant commenced to exist.   The complaint should not have been dismissed, but judgment should have been directed in favor of the plaintiff re-.straining the use of this label or trade-mark by the defendant.   The judgment, therefore, should be reversed, and a new trial ordered, with costs to the .plaintiff to abide the event.   All concur.