RINCE'S METALLIC PAINT CO. v. PRINCE MANUF'G CO. et al.

(Circuit Court of Appeals, Third Circuit. September 18, 1893.)

No. 9.

1. TRADE-MARK—SUIT FOR INFRINGEMENT—ESTOPPEL.
    Where the purchaser, on foreclosure, of a property and business which had long been conducted in connection with a trade-mark, uses the trade-mark under claim and color of title, with the full knowledge of the

former owner, for eight years without objection, this amounts to an acquiescence which will estop the latter, and a subsequent purchaser of the trade-mark from him at sheriff's sale, from afterwards maintaining a suit to restrain such user.

2. SAME—EQUITY—ESTOPPEL.

In a suit in the courts of a state for infringement of the trade-mark "Prince's Metallic Paint," title to the trade-mark being claimed by both parties, relief was refused, on the ground that, even if plaintiff had title, it had forfeited its equity by using the trade-mark in connection with paints made from ores dug from other than the original Prince mine. *Held,* that the defendant in that litigation, who had always used the trade-mark in connection with paints not coming from the Prince mine, had no equity to sustain a suit for infringement against the former plaintiff.

3. SAME—SALE OF BUSINESS—WHEN TRADE-MARK PASSES.

A trade-mark for metallic paint, which has been used for many years by the first producer and his successors solely in connection with paint made at a fixed place, and from ore dug from a certain mine, becomes localized and identified with the mine and place of manufacture so as to pass to the purchaser of the factory, mine, and business, as incident thereto.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

In Equity. Suit for infringement of a trade-mark. The bill was dismissed by the circuit court, (53 Fed. Rep. 493,) and complainant appeals. Affirmed.

John G. Johnson and Charles Barclay, for appellant.

Richard C. Dale, for appellees.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

ACHESON, Circuit Judge. This is an appeal by Prince's Metallic Paint Company, a corporation of the state of Pennsylvania, from the decree of the circuit court, at final hearing upon full proofs, dismissing its bill of complaint, filed June 1, 1888, to restrain the defendant, the Prince Manufacturing Company, also a corporation of the state of Pennsylvania, from using the trade-mark "Prince's Metallic Paint." The court, expressing no positive opinion upon the question of right, based its decree mainly upon want of jurisdiction. Now, undoubtedly, as originally framed, the bill lacked the necessary averments to bring the case within the act of congress for the registration and protection of trade-marks used in commerce with foreign nations; but this defect was cured by appropriate amendments, which, it would seem, were not brought to the attention of the learned judge who heard the case. It is therefore incumbent upon us to consider the merits of the controversy.

The material facts are these: In the year 1858, Robert Prince, as the agent of his wife, Antoinette Prince, commenced the manufacture of metallic paint at Big Creek, in Carbon county, Pa., from iron ore—which he had discovered could be so used—mined from the property of his wife, a tract of about 44 acres of land in that county. The mill, which was also the property of his wife,

at which he manufactured the paint, was in the neighborhood of the ore bed. It was designated "Prince's Metallic Paint Mill." The product was called "Prince's Metallic Paint." He adopted as a trade-mark a label containing the words "Prince's Metallic Paint" in circular form, which he attached to the packages of paint so manufactured and sold by him. Mrs. Prince having died in 1859, thereafter, and until his own death, in November, 1870, Robert Prince, as executor of his wife's will, continued the business, but, from about 1866, in connection with Albert R. Bass, his son-in-law, who had become the owner of the equal undivided one-half of the mill, ore property, and business. Upon the death of Robert Prince, David Prince, as surviving executor of Antoinette Prince and individually, and Albert R. Bass and wife, formed a copartnership under the name of Prince & Bass to manufacture Prince's Metallic Paint, and they continued the business as before until the fall of 1871, when Bass purchased the interest of the estate and of David Prince, and became the sole owner and proprietor of the mill, ore property, and business. Bass continued the business until 1873, when a company was formed by him and others under the name of Prince's Metallic Paint Company, which, as an unincorporated association, carried on the business until 1875, when the company became incorporated under the same name, and to the corporation the mill, ore property, and business were transferred. In the year 1875 the corporation abandoned the old mill at Big Creek, and erected a new mill at Bowman's, several miles distant from the old mill, but nearer the ore bank, on a site then purchased by the company for the purpose. There it manufactured Prince's Metallic Paint until 1878, when it became insolvent and ceased to do business.

During this whole period of time the trade-mark "Prince's Metallic Paint," which Robert Prince had adopted, was used successively by all the above-named proprietors of said business and owners of the said properties which originally belonged to Antoinette Prince. Bass had given a purchase-money mortgage to David Prince, executor, covering the undivided one-half of the original mill and the ore property, and the other undivided one-half thereof was incumbered by a mortgage by Bass to one Heather. The new mill property was also incumbered by a mortgage. In the year 1878 all these mortgages were foreclosed, and the entire properties sold. About the same time the personal effects of Prince's Metallic Paint Company seem to have been sold upon execution, so that that company was deprived by judicial sale of all its tangible property. The sheriff's vendees of the new mill were Balliett and Meendsen. Shortly after he thus acquired title to the mill, Meendsen, who was a judgment creditor of Prince's Metallic Paint Company, caused an execution (plur. fi. fa.) to be levied by the sheriff of Carbon county upon the said trade-mark, which was particularly described in the sheriff's levy, and the same was publicly sold by the sheriff by virtue of said writ to Meendsen in November, 1878.

Early in the year 1879 the Prince Manufacturing Company, the defendant in this bill, was incorporated under the laws of Pennsylvania, A. C. and Robert Prince, sons of Robert and Antoinette Prince, and their wives, being corporators and principal stockholders. In May, 1879, this company acquired the title to the new mill property at Bowman's together with a transfer to the company of such title to the trade-mark in question as Meendsen took under the sheriff's sale thereof. This company also acquired the title to the undivided one-half of the old mill and the ore property which had been sold under the Prince purchase-money mortgage, and the right of possession and use of the other undivided one-half thereof from the sheriff's vendee of that interest. Very soon thereafter the Prince Manufacturing Company began the manufacture of Prince's Metallic Paint at the mill at Bowman's, using the said trade-mark, and it has ever since continued so to do without interruption. From the beginning of its business it has openly claimed the exclusive right to use the trade-mark, and in the year 1879 obtained an injunction against Bass to restrain him from using it upon a paint which he individually was then making. With the exception of this brief use by Bass, the Prince Manufacturing Company was in the exclusive, and, so far as appears, the unquestioned, use of the trade-mark, until the year 1888, a term exceeding the statutory period of limitations. Its product was labeled and sold in the market as Prince's Metallic Paint. The company extensively advertised its paint by that designation. David Prince, the secretary of the company, testifies, without contradiction:

"We advertised it in every possible way we could through the company. We made the name prominent before consumers, large and small; so much so that the name of the paint was a great deal better known than the name of our company. * * * Our name was known comparatively only to the wholesale buyers, while the name of the article was known throughout the country to all consumers, wherever we could make it known."

It is shown that the company's business constantly increased from year to year, insomuch that whereas, prior to 1879 no one year's sales of Prince's Metallic Paint had exceeded 800 tons, the yearly sales by the Prince Manufacturing Company had run up to about 5,000 tons when this suit was brought. The officers of Prince's Metallic Paint Company undoubtedly knew from the first, and all along, that the Prince Manufacturing Company claimed and used the trade-mark as its own.

In the month of November, 1887, certain judgment creditors of the old corporation, Prince's Metallic Paint Company, caused to be issued writs of fi. fa., and, upon returns of nulla bona, alias writs, by virtue of which the sheriff of Philadelphia county, under the act of April 7, 1870, levied upon "the franchises and rights of the 'Prince's Metallic Paint Company' heretofore granted by the commonwealth of Pennsylvania," and in the succeeding January the sheriff sold and conveyed the same, together with "all trade-marks belonging to the said company," to one Richardson, who, with his

associates, in March, 1888, organized a new corporation, adopting as its name the old title, "Prince's Metallic Paint Company." This new corporation was the plaintiff below, and is here the appellant.

Shortly before this present suit was commenced, the Prince Manufacturing Company brought suit in the supreme court of the state of New York for the city and county of New York against Prince's Metallic Paint Company, (the appellant here,) to restrain it from the use of the trade-mark in question. The court at special term decided that the plaintiff had not established its title to the trade-mark and its right to the exclusive use thereof, and therefore dismissed the complaint. Upon appeal, however, the general term of the supreme court reversed the judgment, holding that the plaintiff had an exclusive title to the trade-mark. Prince Manuf'g Co. v. Prince's Metallic Paint Co., 15 N. Y. Supp. 249. But upon further appeal the order of the general term was reversed, and the judgment of the special term affirmed by the court of appeals, upon the ground, however, that the plaintiff (the Prince Manufacturing Company) had made a misuse of the trade-mark, in that it had applied the same to paints manufactured by it from ore taken from mines other than the original Prince mine. Prince Manuf'g Co. v. Prince's Metallic Paint Co., 135 N. Y. 24, 32, 38, 39, 31 N. E. Rep. 990. After stating that "this defense was set up in the defendant's answer," the court of appeals said:

"Whatever contradiction may be found in the record as to other facts, there is one which admits of no dispute, and that is that from 1858, the year in which the manufacture of metallic paint was established by Robert and Antoinette Prince, until the incorporation of the plaintiff in 1879, the label 'Prince's Metallic Paint' had been exclusively applied, first, by the originators of the article, and subsequently, after their death, by their successors in the business, to paint made from ore taken from the so-called original Prince tract of forty-four acres. * * * The label or trade-mark came to have a broader meaning than it originally possessed, and, when attached to packages of paint, indicated not only that the paint was made by Prince or his successors in business, but also that it was made from ore taken from the original Prince mine, and this latter indication constituted an important element of the good will of the business. * * * The plaintiff and its predecessors in the use of the label have by their conduct warranted the public in believing that the words 'Prince's Metallic Paint' meant metallic paint made by Prince or his successors from the ore of the Prince mine."

And at the conclusion of its opinion the court of appeals said:

"It is probable that the plaintiff has acted without any actual intent to defraud; but what it did upon the evidence and findings operated as a deceit upon the public, and this is sufficient to bar relief. The attitude of the defendant does not commend itself to a court of equity. Even if its right to use the label was established, it is aiding outside manufacturers to sell their goods under the label of the corporation. But we place our judgment on the inequitable use of the label by the plaintiff."

It is not pretended that in the manufacture of its paint the plaintiff in this bill (the appellant) uses ore taken from the old Prince tract. In fact, the plaintiff uses ore mined from other lands in that vicinity, through which the same vein of ore as that in the Prince tract extends. It manufactures its paint at Ruther--

ford & Barclay's mill, of which it has had a lease since December 1, 1890. At that mill, and out of the same ore, it makes paint, some of which is called and labeled "Prince's Metallic Paint," and is sold as such, and some of which is called and labeled "Rutherford's Metallic Paint," and is sold as such.

The plaintiff, it is contended, is precluded by the decision of the court of appeals of New York from asking an injunction here. The argument has great force. These two companies were the parties to the New York suit. The court had jurisdiction. The subject-matter of controversy there was this trade-mark. The court held that its use was limited to paint made from ore taken from the original Prince mine, and upon that ground, coupled with the fact that the Prince Manufacturing Company did not confine its brand to paint made from that ore, there was judgment in favor of the defendant, the present plaintiff. Enjoying the benefit of that judgment, it is not easy to comprehend what equity the plaintiff has, seeing its paint is wholly made from other ore.

Waiving, however, the question of estoppel, the plaintiff's title, for which it seeks the protection of a court of equity, is very far from clear. As between the two sheriff's sales of the trade-mark, (if, indeed, either had any efficacy,) much is to be said in favor of the earlier one. Appeal of Lusk, 108 Pa. St. 152, 157. But we strongly incline to the opinion that in 1878–79 the trade-mark "Prince's Metallic Paint" had become so localized—so identified with the Prince mine and the place of manufacture—that it was inseparable therefrom. There is sanction for this conclusion in the adjudged cases. Congress Spring Company v. High Rock Spring Co., 45 N. Y. 291, 302; Manufacturing Co. v. Hall, 61 N. Y. 226; Pepper v. Labrot, 8 Fed. Rep. 29; Kidd v. Johnson, 100 U. S. 617; Milling Co. v. Robinson, 20 Fed. Rep. 217. It was the judgment of the general term of the supreme court of New York, in view of everything, that the trade-mark passed as an incident of the property to the Prince Manufacturing Company with the possession of the works; and that conclusion is the logical deduction from the above-quoted declarations of the court of appeals.

But if the Prince Manufacturing Company was not clothed with a perfect title originally, the long acquiescence by Prince's Metallic Paint Company in the open and exclusive use of the trade-mark by the Prince Manufacturing Company, under a known assertion of right, and, at least, a color of legal title, is a bar to the equitable relief here sought. Assuredly, the new company (the plaintiff) has no greater rights than had the old company when its corporate franchises were levied on in November, 1887. But there had then been such acquiescence for more than eight years in the prosecution by the Prince Manufacturing Company of the business of making and selling Prince's Metallic paint. Its conduct of the business being marked by constant and successful efforts, by advertisement and otherwise, to extend the market for the article, and enhance its reputation, to take from the Prince Manufactur-

ing Company the trade advantages thence ensuing and give them to the plaintiff—the certain effect of an injunction—would be unconscionable.

Now, it is true that, where the plaintiff's title to a trade-mark is clear, mere delay, unaccompanied by anything else, will not ordinarily bar a suit for injunction against a naked infringer. Fullwood v. Fullwood, 9 Ch. Div. 176; McLean v. Fleming, 96 U. S. 245; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. Rep. 143. But we are dealing with no such case. In courts of equity the rule is to withhold relief where there has been unreasonable delay in prosecuting a claim, or long acquiescence in the assertion of adverse rights. Creath's Adm'r v. Sims, 5 How. 192; Godden v. Kimmell, 99 U. S. 201; Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. Rep. 350. Again and again has it been judicially declared that nothing can call into activity a court of equity but "conscience, good faith, and reasonable diligence." McKnight v. Taylor, 1 How. 161; Sullivan v. Railroad Co., 94 U. S. 806, 812. In McLaughlin v. Railway Co., 21 Fed. Rep. 574, Judge Brewer held a bill for the infringement of a patent, alleging the unauthorized use and construction of a patented invention for 13 years, without stating an excuse for the plaintiff's delay in suing, to be demurrable. Laches for even less than the statutory period of limitations, aided by other circumstances, will bar a right. Ashhurst's Appeal, 60 Pa. St. 290, per Strong, J. In Lewis v. Chapman, 3 Beav. 133, the master of the rolls refused an injunction to restrain the infringement of a copyright solely on the ground of six and a half years' delay, where there was knowledge of the commencement and prosecution of the defendant's publication. Long acquiescence before filing a bill for an injunction, with full knowledge of the infringement, is deemed laches equivalent to a breach of good faith. Browne, Trade-Marks, § 497. Hence, in Manufacturing Co. v. Garner, 55 Barb. 151, a delay of nine years in applying for an injunction to restrain infringement of a trade-mark was held to be good cause for refusing it.

Having regard to the whole case, viewed from every standpoint, our conclusion is that the plaintiff has not shown itself to be entitled to the interposition of a court of equity, and accordingly the decree of dismissal is affirmed.