## WINDOW GLASS MACH. CO. et al. v. PITTSBURGH PLATE GLASS CO.

(Circuit Court of Appeals, Third Circuit. October 5, 1922. Rehearing Denied December 4, 1922.)

### No. 2812.

1. Patents ⬀289—Infringement suit barred by laches.

   Where complainant dismissed a suit for infringement, over objection of defendant, which offered to furnish drawings of its alleged infringing machines, a delay of 11 years before commencing another suit on the same patents, during which time defendant had expended nearly $1,000,000 in new plants and machinery, *held* unreasonable, and to constitute laches, which barred complainant from relief.

2. Patents ⬀289—Laches, which will bar relief for infringement, stated.

   Mere delay will not ordinarily bar a suit for injunction against a naked infringer, but unreasonable delay, in which is involved the element of lack of diligence and consequent inequity, will bar relief.

3. Patents ⬀289—Pendency of other suits held not valid excuse for delay.

   Institution of suit for infringement against one party is not alone notice to another, not a party to abstain from a practice which he is pursuing in good faith, nor is there any quality in so called test suits which places additional liability for prior infringements upon those who are not parties.

4. Patents ⬀328—762,880 and 822,678, for apparatus and method for drawing glass cylinders, held not infringed.

   The Chambers patent, No. 762,880, and the Lubbers patent, No. 822,678, for apparatus and methods of drawing glass cylinders from a bath of molten glass, *held* not infringed.

5. Patents ⬀328—886,618 and 1,020,920, for apparatus and method of drawing glass cylinders, not infringed.

   The Lubbers patents, No. 886,618 and No. 1,020,920, for apparatus and method of drawing glass cylinders, *held* not infringed by apparatus used by defendant.

6. Patents ⬀328—914,588, for method of drawing glass cylinders, held not infringed.

   The Lubbers patent, No. 914,588, for method of drawing glass cylinders, known as the surface tension patent, in which the effect of the surface tension of the molten bath on the thickness of the cylinder was overcome by adjusting the point of draw, *held* not infringed by the method of the Slingluff patent, No. 1,203,423.

7. Patents ⬀328—841,011, for method of cooling glass cylinders while being drawn, held not infringed.

   The Hart patent, No. 841,011, for method of cooling glass cylinders while being drawn, *held* not infringed.

8. Patents ⬀328—828,147, for treatment of drawn glass cylinders for flattening, void for lack of invention.

   The Speer & Harvey patent, No. 828,147, for method of treating a drawn glass cylinder for flattening into sheets, *held* void for lack of patentable invention.

---

⬀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Suit in equity by the Window Glass Machine Company and the American Window Glass Company against the Pittsburgh Plate Glass Company. From the decree, complainants appeal. Affirmed.

George E. Stebbins and Clarence P. Byrnes, both of Pittsburgh, Pa., and Livingston Gifford, of New York City, for appellants.

Marshall A. Christy and George B. Gordon, both of Pittsburgh, Pa. (James C. Bradley, of Pittsburgh, Pa., and Charles Neave, of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal from a decree of the District Court for the Western District of Pennsylvania involving a number of patents relating to the manufacture of window glass by machinery. In this opinion we shall assume that any one interested in this case is familiar with the literature of the litigation on these inventions.[1] Except as enlarged perhaps by subsequent practices of the defendant and others, the art to which the inventions of the patents relate is wholly embodied within the patents themselves. Therefore, the discussion of these patents, to most of which we have already given a pioneer or basic construction, will afford a statement of the art sufficient to understand the grounds and scope of this decision.

The bill asserts validity and charges infringement of claims of fourteen patents owned by the plaintiffs. The trial court held certain of them valid and others invalid, and certain of them infringed and others not infringed, and that infringement, when found, occurred at different times and in different places. Being in several aspects both for and against the opposing parties, the defendant accepted the decree; the plaintiffs appealed, bringing here for review only the portions of the decree which are adverse to their claims.

These several inventions relate to the drawing of glass cylinders by machinery. From cylinders the making of window glass is completed by a process with which, except in one particular, we are not concerned. While separately patented, these inventions are so correlated in the process and are so dependent one upon another in their operation that they must be employed together to make the final product. Remarkable as they are in the aggregate, no one of them alone can produce window glass. Nor indeed can a small number of them. As more than fifteen years were consumed in their development and as

---

[1] Window Glass Machine Co. et al. v. Okmulgee Window Glass Co. (D. C. E. D. Oklahoma), affirmed in Okmulgee Window Glass Co. v. Window Glass Machine Co. et al., 265 Fed. 626; Window Glass Machine Co. et al. v. Consolidated Window Glass Co. et al. (D. C. W. D. of Pa.), affirmed with modifications in 261 Fed. 362, certiorari denied 251 U. S. 558, 40 Sup. Ct. 179, 64 L. Ed. 413; Window Glass Machine Co. v. New Bethlehem Window Glass Co. (C. C. A.) 264 Fed. 822; Window Glass Machine Co. v. Smethport Window Glass Co. (D. C.) 266 Fed. 85; Window Glass Machine Co. v. Pittsburgh Window Glass Co. (C. C. A.) 276 Fed. 849; Window Glass Machine Co. v. Brookville Glass & Tile Co. (D. C.) 229 Fed. 833.

the patents were granted at different times over a span of ten years, the progress toward scientific and commercial success was feeble at first and thereafter it was halted by new problems constantly arising and calling for solution before going farther. After great labor and the expenditure of much money the first inventions for drawing window glass by machinery were embodied in three patents. These became known in the art as "Lubbers' original patents." They were granted in 1902 and are

## Lubbers' Patents Nos. 702,013, 702,014 and 702,015.

The first and third of these patents are for apparatus for the drawing of glass cylinders from a bath of molten glass. The claims here in suit relate solely to what is termed the "molten bath." The second is for a method of drawing glass from a molten bath and, in addition, for methods of increasing the air supply as the cylinder lengthens and for taking down the cylinder when drawn.

The plaintiffs charge the defendant with infringement and pray for an injunction. At the time of the decree they were not entitled to this relief because the patents had expired. They were entitled at most to the incident of an accounting. The patents had already been held valid in the Consolidated Case and the Okmulgee Case and had been given a construction broad enough, the defendant admits, to cover its apparatus and methods. The learned district judge declined to rule on the question of infringement and dismissed the bill as to these patents on the ground that the plaintiffs were equitably barred in their action by their laches and by their acquiescence in the practices of the defendant through a long period of years. Hence the issue on this appeal with respect to these three patents is solely one of laches and stands or falls on the following facts and circumstances, taken mainly from the statement of the case in Judge Thomson's opinion:

[1] James A. Chambers, a glass manufacturer of wide experience and a former president of the American Window Glass Company, one of the plaintiffs, conceived the idea of drawing window glass by machinery and, collaborating with J. H. Lubbers, an expert in glass blowing, conducted on behalf of his company an elaborate system of experiments to that end. Laboring with them was H. G. Slingluff, superintendent of the works. Patents were granted to Lubbers for the three inventions we are now discussing and for several others. Patents were also granted to Chambers. Although these inventions, as it was afterwards learned, basically solved the problems of the molten bath, air control, and taking down the cylinders—all capital problems—they were of little commercial value until brought into co-operation with means and methods later invented. Hence, these inventions, without the others, were discouraging and had been made at such an enormous cost of time and money that trouble arose in the plaintiff company. As an outcome Chambers and Slingluff left its employ. Slingluff also had become an inventor in this art and had been granted patents for his inventions.

In April, 1906, about a year and a half after he had severed his connection with the company, Chambers introduced Slingluff to offi-

cers of the Pittsburgh Plate Glass Company, the defendant, and represented to them that Slingluff had some inventions which he regarded of great value. He explained that Slingluff's method related to the drawing of cylinders directly from the tank instead of from a pot as practiced by the plaintiff company; that in his experience in manufacturing glass cylinders he had always desired to draw from the tank, as ladling molten glass, necessary in the pot method, involved expense and injured the quality of the finished product, and that he thought great advantages, both in quality and cost of production, would result from the use of Slingluff's method; that in the various efforts which the American Window Glass Company had made to draw direct from the tank it had encountered serious difficulties which he believed the Slingluff method would overcome. He further stated that with his knowledge of the patents belonging to the American Window Glass Company, some of which he himself had taken out, he thought that the Slingluff method of drawing cylinders was entirely outside of their field. This view was later confirmed by the opinion of patent attorneys of the first rank to whom the defendant had submitted the question. Slingluff told the defendant that he had offered his invention to the American Window Glass Company and it had refused it. Acting upon this information the defendant in September, 1906, leased a small plant in Allegheny and began a series of experiments on the Slingluff method, which continued for about a year. Being satisfied with the results, the defendant determined upon the manufacture of glass on a commercial scale. On September 30, 1907, however, the American Window Glass Company (which for the present we shall call the plaintiff company) filed a bill in equity against the defendant and against Chambers and Slingluff in which it averred that the apparatus and method used by the defendant infringed its patents Nos. 702,013 to 702,017, inclusive, and asked for an injunction and an accounting. Paragraph 12 of that bill is almost identical with paragraph 7 of the present bill as to notice to the defendants of the granting of Letters Patents and infringement thereof, and the manufacture, sale and use, after notice, of the apparatus and methods claimed and embraced in its patents. A month in advance of the time prescribed by the rules, the defendants filed an answer to the bill stating their defense. At the same time defendants' counsel wrote a letter to counsel for the plaintiff enclosing copies of the answer and requesting that the case be prepared for trial and argued as soon as possible, and suggesting a readiness to co-operate in bringing the case to an early hearing. The defendants received no reply to this communication and a little later the plaintiff moved the court for permission to dismiss its bill. This was strongly opposed by the defendant company for reasons set forth in an affidavit of its president to the effect that the operations of the defendant company at its plant in Allegheny were purely experimental, none of the glass manufactured having been sold; that becoming satisfied with its experiments, it had discontinued them and had closed the Allegheny plant; that as a result of its experiments, the defendant company was engaged in making arrangements for the purchase of a plant suitable for the manu-

facture of window glass commercially; that it was arranging to equip that plant with proper furnaces and apparatus for drawing glass by machinery; that "its intention is, and has been since the negotiations for the purchase of the plant were commenced, to engage in the manufacture of window glass as soon as the plant can be properly equipped, and it expects to commence such manufacture on a commercial scale within the next three months"; that it intended, as rapidly as commercial conditions would permit, to acquire and build other plants for the purpose of drawing window glass by machinery; that it was advised by counsel that the methods it proposed to put into practice and the apparatus it proposed to put into operation are not covered by any outstanding patents; and that it had instructed its attorneys to co-operate with the plaintiff and take all proper steps to prepare and bring the case to an early hearing and try out the question of patent rights. The affiant further stated that counsel for the defendant company offered counsel for the plaintiff company, if he would agree to speed the case, full and complete drawings of the furnace and apparatus, then under construction, which it intended to employ in the manufacture of window glass in its proposed commercial plant, and concluded with a direct tender of these drawings to the plaintiff and an offer further to co-operate in hastening the trial of the case. The plaintiff company made no reply to the offer made by counsel for the defendants or to the tender made directly by the defendant company itself.

In the face of this protest, on December 9, 1907, the bill was dismissed without prejudice. In this situation the defendant company consummated the proposed purchase, which afterwards became known as the Mount Vernon plant, equipped it with furnaces and machinery and began operation, which in August, 1909, grew to a commercial scale. It gradually enlarged its works until it had an investment of $375,000.

These operations continued without notice or objection of any kind from the plaintiffs for more than six years, or, until July of 1914, when the same American Window Glass Company together with the Window Glass Machine Company, having recently commenced suits for infringement of their patents against other companies, again notified the defendant company of infringement and advised that they had a bill prepared and were ready to file it. Counsel for the defendant agreed to accept service, but as a personal accommodation asked that the actual filing of the bill be delayed for two or three weeks. This was agreed to. At the time notice was served the defendant was contemplating the erection of a large glass plant at Clarksburg, West Virginia, but on account of the notice deferred action for six months. As the plaintiffs did not bring the threatened suit, the defendant erected its plant at Clarksburg in the early part of 1915 and began operations in August upon an investment of $550,000. After the notice, in July, 1914, of their proposed suit for infringement nothing further was heard from the plaintiffs until December 31, 1918, when they filed the present bill. This was eleven years after one of the plaintiffs had brought the first suit and voluntarily dismissed it; nine years

after the defendant had invested a large sum of money in the Mount Vernon plant and had begun commercial operations; four and one-half years after the plaintiffs had given notice of the proposed second suit; and three and one-half years after the defendant had invested an even larger sum in the Clarksburg plant and had there begun commercial operations. These dates are facts which figure against the plaintiffs' bill in the present action. The circumstances were such, without repeating them at length, that the plaintiffs knew or were chargeable with knowledge of the practices and the apparatus employed by the defendant at its several works during these periods. Foster v. Railroad Co., 146 U. S. 99, 13 Sup. Ct. 28, 36 L. Ed. 899; Johnston v. Standard Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480. On these facts and circumstances the defendant makes the defense of laches.

[2] This defense is based on a well-settled principle of law. In its application courts recognize the general rule that, in a case of this kind, mere delay, unaccompanied by anything else, will not ordinarily bar a suit for injunction against a naked infringer. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526; Prince's Metallic Paint Co. v. Prince Mfg. Co., 57 Fed. 938, 6 C. C. A. 647, infra. But they also recognize a distinction between mere delay and unreasonable delay, where in the latter is involved the element of lack of diligence and the consequent inequity, under the circumstances, of permitting the claim to be enforced. In Prince's Metallic Paint Co. v. Prince Mfg. Co., 57 Fed. 938, 944, 6 C. C. A. 647, 652, Judge Acheson, speaking for this court, stated the principle as follows:

"In courts of equity the rule is to withhold relief where there has been unreasonable delay in prosecuting a claim, or long acquiescence in the assertion of adverse rights. Creath's Adm'r v. Sims, 5 How. 192; Godden v. Kimmell, 99 U. S. 201; Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. 350. Again and again has it been judicially declared that nothing can call into activity a court of equity, but 'conscience, good faith, and reasonable diligence.' McKnight v. Taylor, 1 How. 161; Sullivan v. Railroad Company, 94 U. S. 806, 812."

When delay in prosecuting a claim is so unusual as to carry with it the appearance of being unreasonable, as in this case, there devolves upon a plaintiff the burden of disclosing the impediments to an earlier action; of showing, if ignorant of his rights, how he had remained in ignorance so long; and of revealing how and when he first came to a knowledge of the matters on which he relies in his bill for relief. Badger v. Badger, 2 Wall. 87, 17 L. Ed. 836; Hardt v. Heidweyer, 152 U. S. 547, 14 Sup. Ct. 671, 38 L. Ed. 548. In other words, the plaintiffs in this case are bound to excuse the delay which they themselves disclose by their bill. Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049; McLaughlin v. Railway Co. (C. C.) 21 Fed. 574. And this they have attempted to do in two ways: First, they affirm that the defendant was a wilful trespasser upon their patent rights and was, therefore, a wanton and piratical infringer. They base this contention on the secrecy with which the defendant conducted first its experiments and later its commercial opera-

tions. Yet a like secrecy was practiced by the plaintiffs themselves. Secrecy was maintained by both for the very good reason that each was feeling its way in a new art and sought to protect its experimentation and the results. In the light of the events of 1907—not in the light of the decision of this court in the Consolidated Case in 1919—we agree with the learned trial judge that the defendant adopted the Slingluff method in perfect good faith and was not a wanton infringer.

[3] Next, the plaintiffs excuse their delay in enforcing their patent rights against the defendant on the contention that they waited until they had completed their inventions and had acquired their patents before instituting test suits to determine their validity and scope; that they instituted such suits against the Consolidated Window Glass Company and others in 1914; that these suits were notice to the world that they intended to enforce their patent rights; and that, in consequence, no laches can be imputed to them for waiting until these suits were decided before bringing actions against the remaining infringers. The infirmity in this position is that the last of the patents in suit was granted in 1912, two years before the institution of the test suits; that there is no quality in suits, which the plaintiffs call test suits, which places additional liability for prior infringements upon those who are not parties; that the institution of suit for infringement against one party is not alone notice to another party to abstain from a practice which he is pursuing in good faith; and, finally, having offered in 1907 to try out all questions of infringement raised by the plaintiff's bill of that year; having insisted on an early hearing; protested against the dismissal of the bill; offered to furnish drawings of the apparatus in controversy, and, if infringement was involved, having by its announced purpose to make window glass by machinery made as distinct a threat of infringement as the law could require as the basis of an injunction, the defendant had a right to regard the plaintiffs' inaction through all these years as an acquiescence in its practices, or, otherwise it had a right to be proceeded against with reasonable diligence and without awaiting the determination of rights between the plaintiffs and others.

Feeling that the plaintiffs have not sustained the burden which the law placed upon them on the issue of laches, we affirm that part of the decree by which the trial court dismissed the bill as to the Lubbers patents Nos. 702,013, 702,014 and 702,015.

### Chambers' Patent No. 762,880 and Lubbers' Patent No. 822,678.

[4] These patents were granted in 1904 and 1906 respectively and were owned by the American Window Glass Company, one of the plaintiffs, when in 1907 it brought its first suit for infringement against the defendant on Lubbers' original patents. Supra. All facts upon which the trial judge in the present suit sustained the defense of laches and dismissed the bill with reference to Lubbers' original patents apply with equal force to the plaintiffs' laches in bringing this action on the two patents now under consideration, except the one fact that infringement of these patents was not charged in the first bill. While we are of opinion that the learned trial judge might, upon the

same ground, have dismissed the bill as to these patents, he rendered the decision on the issue of infringement. We shall follow his course.

Infringement of these two patents at the Clarkesburg plant was not controverted, nor was infringement at the Mount Vernon plant prior to January 1, 1920, controverted. After that date, the learned trial judge found there had not been infringement of either patent at the latter plant. Therefore, the issue on this appeal is one of infringement at Mount Vernon since January 1, 1920.

The Chambers patent (No. 762,880) is for a method of drawing cylinders upward from a bath of molten glass and gradually and automatically increasing the speed of the drawing operation for the purpose of overcoming the natural tendency of the glass to thicken as the cylinder lengthens and, accordingly, for the purpose of maintaining glass of uniform thickness throughout the draw. Chambers' method, discussed at length in the opinion of this court in the Consolidated Case (261 Fed. at page 376), was put into practical operation by the use of a conically shaped drum, rotated at uniform speed. Beginning at the smaller end of the drum the line drawing the cylinder climbed with each revolution to the broader or larger portions, thereby progressively and automatically increasing the speed at which the cylinder was drawn upward. This patent became known as "Chambers' increasing speed patent" and its invention was a step forward in producing glass of uniform thickness, the thing it was intended to do.

Lubbers' patent (No. 822,678) also relates to the speed of drawing cylinders, discussed at length in the opinion of this court in the Consolidated Case (261 Fed. at page 377). Chambers had shown how the body of a long cylinder could be kept of uniform thickness throughout the draw by gradually and automatically speeding up the drawing of the cylinder. But in addition to the necessity of regulating the drawing of the main body of the cylinder, troubles developed in the cap at the top of the cylinder and also in the lower part of the cylinder, just above the molten mass, where it is severed from the bath. It was found in the drawing of a long cylinder that the cap which had to support its whole weight gave way under the strain Difficulty was also experienced in cutting away a cylinder from the bath when its walls were thick. How to make the cap of the cylinder strong and the bottom of the cylinder weak was a problem. Lubbers solved it by providing three speeds in the drawing operation, and he did it without interfering in the least with the Chambers increasing speed method. He first provided a low speed when the cap was forming, supplying a small amount of air to develop the neck and allowing sufficient time for the glass on the bait to become enlarged and set; second, in drawing the main body of the cylinder, he speeded up the drawing as in the Chambers method; and, third, when the cylinder reached the desired length and its lower portion, still dipped in the molten glass, was to be capped off, he conceived the idea of drawing the end thin so that it might be easily sheared. To effect this he changed to a third and still higher speed. The invention produced all the results desired. The patent came to be known as "Lubbers' three speed patent."

What the defendant did at its Mount Vernon plant after January 1, 1920, was not to employ either a gradually increasing speed, or three speeds, as provided in the two patents, but to use just one speed. In doing this we think, first, it avoided infringing the Chambers patent No. 762,880. But it was confronted with the problem of obtaining a cap of a size and strength which, as it ascended into the air, would sustain the weight of a thirty-five foot cylinder. To attain this the defendant's operation was as follows: Starting the cylinder at one speed (about fourteen inches a minute) a stop was made at a short distance above the molten glass to permit a cap to form, aided by air flowing through the bait from the high pressure system. When the cap was sufficiently enlarged and set, the drawing of the cylinder was resumed at the same speed and was continued at that speed throughout the operation under low pressure with occasional puffs given by the blower from the high pressure system to maintain a pressure sufficient to hold the cylinder out. The rheostats, which formerly controlled the speed, were removed, leaving the blower with no control over the speed. The speed, therefore, remained uniform throughout the draw. The result was just the thing obviated by the inventions of the patents under discussion, namely; thickening glass as the cylinder lengthened, so that glass of single-strength was cut from the lower portion of the cylinder and often glass of double-strength was cut from the upper portion. While Chambers and Lubbers invented methods which solved problems that were truly difficult, and while for a time their methods seemed to be the only solutions, we are of opinion that the defendant also solved the problems and solved them in a way wholly different from the methods of the patents. Whether its method was as good as those of the patents is another matter.

We affirm that portion of the decree holding that the claims of the Chambers patent No. 762,880 and the Lubbers patent No. 822,678 in suit were not infringed at the Mount Vernon plant since January 1, 1920.

### Lubbers' Patents Nos. 886,618 and 1,020,920.

[5] These patents, one for an apparatus and the other for a method, were granted in 1908 and 1912 respectively and became known as "Lubbers' vent patents." On the claims in suit, which have been repeatedly held valid, the question on this bill is infringement within the statutory period of six years prior to the filing of the bill.

When these patents (involving in principle one invention) were before us in the Consolidated Case we were greatly impressed with their merit. The invention is so simple that on first view it seemed audacious to ask for patents, yet the problem solved was so difficult and the way in which it was solved was so effective that we had no doubt the patents involved invention of high order. But first as to the problem.

When a glass cylinder is approaching a height of thirty-five feet and has a diameter of several feet, air of course is contained in its interior, otherwise it would collapse from external pressure. But the air content varies as the cylinder rises with the result that the walls of the cylinder moved in and out. If it does not collapse before it

reaches the top, the cylinder is at best of irregular shape and of doubtful use in the manufacture of window glass. This habit had to be corrected. It also became necessary in drawing a cylinder to chill the glass as it is developed and to equalize the heat in the glass throughout the drawing. If this could be attained, it was thought, glass of greater uniformity both in surface and thickness could be produced. Inside chilling was therefore suggested. This had the advantage, among other things, of permitting a greater speed of drawing.

Several means were suggested for regulating the inflow of air through the bait and thereafter for regulating the air pressure in the cylinder. These involved more or less intricate and automatic mechanism. None proved satisfactory. All were abandoned when Lubbers made the invention of the patents. This invention consisted of nothing more than poking a hole in the air system. Past this hole air was pressed through the bait into the cylinder and out of the hole any surplus of air escaped. The results were constancy of air pressure and uniformity of cylinder walls. Simple as it seems, yet measured by its achievements, we regarded this an invention of high merit. Consolidated Case. What was the defendant's method? Admittedly, the defendant used the vent of the patents in its early operations at Mount Vernon. The evidence shows, we think conclusively, that it discarded the vent of the patents at that plant more than six years prior to the bringing of the present suit. Therefore the question is, whether the apparatus and method later used by the defendant infringed the patents.

What the defendant did was this: It established an air system by which air was forced by a fan through pipes to the bait and through the bait to the cylinder. The air pressure in this system, as we understand it, was not cut down by throttle valves or other means obstructing the travel of back pressure but was an open system whereby air pressure was regulated primarily by the fan that supplied it and secondarily by the blower, who, when he saw the cylinder narrowing, gave it a puff of high pressure air in order to keep it out at full size. It is just here that the plaintiffs charge infringement, claiming that in the defendant's air system the fan itself, in its construction and operation, acts as a vent and regulates the pressure of the cylinder. They make the point that a fan is a hole surrounded by blades, or that the eye of the fan is a hole, in either instance operating as a vent through which air in its back pressure escapes and thus permits of automatic equalization of air pressure in the cylinder. The fans used were standard type, bought in the open market and operated like any fan feeding air through a pipe above atmospheric pressure. The fan fed the air to the cylinder according to the condition of air pressure in the cylinder. When the pressure in the cylinder increased, less air was taken in by the fan; when it decreased, the fan supplied more air; the result of the operation being to keep the pressure relatively constant. To this was supplemented the watchfulness and valve manipulation of the blower. The open vent of the patents is something wholly different. It is in the nature of a self-acting safety valve. It does not control the inflow of air ex-

cept as it controls the outflow. It requires no human assistance. But in the defendant's operation the fan delivered air according to the varying conditions of the air pressure in the cylinder and thereby regulated the air pressure of the cylinder in a way different from that of the invention of the patents. That the defendant's apparatus and method were inferior to those of the patents is of no concern.

As another ground of infringement the plaintiffs charge that the defendant permits a leak in its air system at a joint where the bell shaped terminal of the air line rests on the top of the bait pipe, and in this way has, for all practical purposes, the vent of the patents. On this issue of fact, based on conflicting testimony, the learned trial judge found non-infringement. We agree with him.

We affirm that portion of the decree holding the claims of Lubbers' patents Nos. 886,618 and 1,020,920 in suit not infringed by the defendant within six years prior to the filing of the bill.

### Lubbers' Surface Tension Patent No. 914,588.

[6] It was recognized that uniformity in the thickness of glass intended for use as window glass was an absolute necessity in the industry. To obtain uniformity those working in this newly developing art encountered many problems. They no sooner solved one than they were confronted by another. They solved, in a measure, the problem of uniform thickness by the agencies of temperature, distending air, and speed, and for them were granted the patents we have discussed. But, as is shown in the opinion of this court in the Consolidated Case (261 Fed. at page 379), in addition to these positive controlling agencies still others were required to overcome serious and obscure difficulties which, in the development of this art, were always arising. For example, in drawing a cylinder it would seem a natural thing to drop the bait into the center of the pot and make the draw from that point; yet for some strange reason it was found in practice that the cylinder, as it was drawn, began to shift from the center to the side in an unaccountable way. Glass so drawn was "thick and thin" and resulted in a large amount of breakage both in the drawing and subsequent treatment and was difficult to flatten properly. These were facts. That they involved a problem was evident. But there was as much obscurity about the problem as there was about its solution.

Lubbers observed that when molten glass is fed into a receptacle, for example, a refractory pot, it may be of a different temperature and stiffness in one portion of the pot from what it is in another portion, and that the heat of the pot itself may vary in different parts. He found that the heat of the molten bath in the pot also varied with the changing shifts of men, being affected by their different habits of ladling glass from different places in the tank. There was in consequence a difference in temperature on the surface of the molten bath, and its effect on the depending bait with its newly forming cylinder was to draw it away from the central position in which it had been dropped. This action, Lubbers conceived, was due to surface tension, a known force in nature. He was right. Thus the problem

of surface tension in this art was discovered. Lubbers solved the problem by three steps; first, by observing on one draw how much the surface tension of the glass in the pot, with its then fixed temperature, drew the bait off-center; second, by adjusting the bait on the next draw off-center and against the tension disclosed in the previous draw; and third, by relying upon the force of surface tension in its discovered direction and strength to recenter the bait. For this invention he was granted the patent we are discussing (later known as "Lubbers' surface tension patent"), of which a typical claim is the following:

"7. The method of drawing glass of substantially uniform thickness from a molten glass bath, consisting in adjusting the point of draw to provide for substantially uniform surface tension in the different parts of the article being drawn, substantially as described."

The means described by the claim is a carriage on which the bait is adjustable in two directions at right angles from each other, from front to back and from side to side. This enables the bait to be dropped at any point in the pot beneath. As with the invention of the vent, so with this invention, we have been much impressed. We realize that in making this invention Lubbers had first to discover the problem. The problem was one involving a natural force, and he solved it effectively. But the defendant maintains that it too has solved the problem and has solved it in a different way. If it has, then it did not infringe.

Remembering that the word "adjusting," as it appears in the Lubbers' patent, means a shifting of the bait or point of draw from time to time as conditions may require to compensate for differences in the heat of the molten bath, it should first be noted—though otherwise contended by the plaintiffs—that the defendant made no such adjustment. The adjustment it made was in the molten bath, not on the bait. What it did was this:

During the early part of the defendant's operations a ring was used, either floating or resting on a ledge in combination with the top-stone. Drawing as it was from a forehearth where the glass was hottest at the tank end, it had much trouble with thick and thin glass. Later, perhaps in 1911, Slingluff introduced his present "anchor" (Slingluff's patent No. 1,203,423), which, in the words of the patent, was:

"In a combination in apparatus for drawing glass cylinders, a draw tank containing a body of glass and heated to a greater extent on one side than on the other, a draw stone lying in the tank surrounded by the glass thereof, having an opening therethrough with the wall thereof toward the more highly heated side of the tank inclined to provide a shield projecting beneath a portion of the edge of the cylinder being drawn and having the opposite wall substantially vertical."

Briefly described, this invention consists of a draw stone, immersed in the bath, with one side vertical and the other side slanting from top to bottom, downwardly and inwardly, toward the center of the inlet opening and away from the more highly heated side of the tank. This slant or incline came to be known as the "lip." This lip extends

around to the sides, gradually diminishing until it disappears. As there is less depth of intensely hot glass lying above the lip than in the parts of the bath where there is no lip, the temperature is seemingly regulated in the direction from front to back, and perhaps to some extent laterally. The result, however, is the equalization of temperature of the glass in the draw opening.

In this operation of the defendant the bait is not centered with reference to the surface of the glass in the draw opening but it is centered with reference to the inlet opening beneath. The lip at its widest point extends inwardly six inches so that the bait is set in line with a point three inches outwardly from the center of the glass on the surface. The bait is dropped to this point, we have found, without any adjustment of its mechanism. It is set at the beginning of the fire and is not adjusted thereafter.

The plaintiffs maintain that the defendant's practice of setting the bait once and for all and dropping it into the molten bath off the center of its surface is an adjustment within the terms of the patent intended to overcome the natural force of surface tension. They insist very earnestly upon this position not with reference to its details alone but with reference also to the breadth to which the Lubbers patent is entitled because of Lubbers' discovery of the obscure problem of surface tension. Like ourselves, the plaintiffs have been greatly impressed with the need and difficulty, in creating this art, of first discovering its problems, and with those discoveries as bearing on the quality of the inventions which solved them, and thence on the scope of the patents. But unlike ourselves they seem impressed with the idea that their patents cover the problems as well as their solutions. Difficult as the problems were to discover, the discoveries of the problems were not inventions, and, manifestly, the patents do not cover them. Although Lubbers discovered the natural force of surface tension as operating in this art and disclosed it as one of its major problems, yet anyone was free to try to solve that problem in another way, and, if he succeeded, to ask for the reward of a patent. As Lubbers was not granted a monopoly of the problem of surface tension but was granted a monopoly only for his solution of it, the defendant was at liberty to solve that problem in another way if it could. And we think it did.

Summarizing, what the defendant did was to recognize that on the surface of the bath there are many variables of heat due to a variety of conditions. Instead of yielding to these surface variables and adjusting the draw relative to them, it went below the surface, extended a lip into the molten glass, corrected the variables, and ascertained a fixed position from which thereafter all draws could be made without adjustment. That position, while being off-center of the surface of the molten bath, was on-center of the submerged plane of the bath which extends from the lower part of the lip around the sides of the draw stone. Without determining whether this constitutes invention, or, if so, without passing on its quality, we think Slingluff's method of overcoming surface tension was wholly outside the field of the Lubbers patent, and, therefore, we affirm that portion of the decree

284 F.—42

holding the claims of Lubbers' patent No. 914,588 in suit not infringed at the Mount Vernon plant since January 1, 1920.

### Hart Patent No. 841,011.

[7] Like Lubbers' original patents, this patent attacks the problem of temperature. Whereas Lubbers provided a cooling ring and means for cooling the glass as it ascended from the bath (No. 702,016), Hart provides for "cooling the glass and causing it to set solely by the action of the atmosphere." Hart is Lubbers without a cooling ring. If the omission of the Lubbers cooling ring constitutes invention, it obviously was the invention of the first one to disclose such omission. Hart was not that man, for Lubbers, in the patent last referred to, had already said:

"The use of the outer water-cooled ring may be dispensed with."

The claims of the patents here on appeal were held valid by the District Court in the Brookville Case; and in this case, if valid, they were held not infringed. The question here on appeal, therefore, is only that of infringement. This question turns on the scope of the claims. We think it clear that Hart was dealing with a pot or other receptacle "which is heated during the drawing." By his method he provided for "protecting the glass at the drawing point from such applied heat" and thereafter cooling the glass by the atmosphere. But the defendant did not use a pot. It drew from the bath of glass in the tank. Hart was dealing with a distinct body of glass in a pot or other receptacle which because of its size required special heating to avoid cooling too rapidly during the drawing operation. The defendant used the body of glass in the tank, heated not specially but just according to the tank run, and having no such problem as Hart claims to have solved, it had no occasion to use Hart's method.

We affirm the portion of the decree holding claims 1, 2 and 6 of the Hart patent No. 841,011 not infringed.

### Speer and Harvey Patent No. 828,147.

[8] This patent is for a method of preparing a cylinder for the next process of flattening into a sheet, and is known as the "shawling patent." Obviously, it is an outgrowth of an old practice in the hand-blowing art where, as also in the early days of the machine-drawing art, cylinders were of small diameter, varying from fourteen to twenty inches. In preparing a cylinder for flattening it was the practice to divide it into short lengths or sections and to cut or crack each section from end to end along a single line. The section was then placed on the flattening-stone of the oven with the cracked line uppermost. As it softened under the heat each side fell away from the crack and, opening gradually, sank upon the flattening-stone. In this operation skill of the oven man was required to prevent the cylinder from collapsing or from flattening unevenly. With the increase in the diameter of a cylinder from inches in the hand-blown method to feet in the machine-drawn method, it became difficult or impossible to flatten cylinder sections into single sheets without providing larger ovens.

Larger sheets also called for higher skill in oven-handling. To meet this situation the patentees conceived the idea of cracking the cylinder in two or more places instead of in one place, thus dividing it into two or more segments, and of subjecting, one at a time, the partially cylindrical segments to the oven treatment. In other words, the patentees cut the cylinder to fit the oven just as a tailor cuts the cloth to the garment. When machine-drawing had reached such a point that a machine-drawn cylinder was too large to be flattened in an oven of ordinary size, the cutting of the cylinder, longitudinally, into two or more pieces was, we think, but a natural development of the industry. Atlantic Works v. Brady, 107 U. S. 192, 199, 2 Sup. Ct. 225, 27 L. Ed. 438; Hansen v. Slick, 230 Fed. 627, 632, 145 C. C. A. 37. Although the learned trial judge dismissed the bill on the ground that, if involving invention, the patent was void by reason of prior use for more than two years, we are disposed to hold the patent void for want of patentable invention, and, accordingly, affirm the decree dismissing the bill as to this patent.