## MARLATT v. MERGENTHALER LINO-TYPE CO.

### No. 4482.

District Court, S. D. California, C. D.
Feb. 27, 1947.

William R. Litzenberg, of Los Angeles, Cal., for plaintiff.

Morrison, Kennedy & Campbell and Luther E. Morrison, all of New York City, and Lyon & Lyon, Leonard S. Lyon, and R. E. Caughey, all of Los Angeles, Cal., for defendant.

WEINBERGER, District Judge.

On May 22, 1945, plaintiff filed his complaint herein, alleging that defendant had been and was infringing plaintiff's letters patent by making, selling and shipping into this District and using, typographical machines and linotype machines embodying the patented invention of plaintiff. By said complaint, plaintiff prayed for injunctive relief and for an accounting for profits and for damages.

On September 12, 1945, defendant filed a motion to dismiss for lack of jurisdiction on the ground that the defendant is not an inhabitant of the Southern District of California, and that it has no regular and established place of business within said

District and has not committed any acts of infringement therein.

A hearing on this motion was had on February 21, 1946 before Judge C. C. Cavanah, then sitting in this District under assignment, and after such hearing, he denied the motion.

Defendant then filed its answer, wherein among other defenses, defendant re-alleged the matters which formed the basis of the motion to dismiss above referred to, and wherein as a further defense defendant alleged that by reason of laches plaintiff is barred from maintaining this action.

Upon motion of the defendant, the case was set for trial on the issues of venue and laches. The plaintiff testified orally, and the testimony of defendant's witnesses was introduced in deposition form, at said trial.

Plaintiff urges that the Judge who heard the motion to dismiss for lack of venue, by his denial of said motion, made a finding for all purposes that defendant had a regular and established place of business in the District, and also that acts of infringement had been committed by defendant within the District; plaintiff further contends that because of such rulings this Court was precluded from receiving evidence as to those matters.

The above motion to dismiss was heard on the pleadings and affidavits filed by the parties; the affidavit filed by plaintiff contained some statements which were clearly hearsay, and which were not supported by direct testimony at the trial.

It has been held that affidavits may be considered in addition to the pleadings on a motion to dismiss, but that such a motion should not be granted if a material fact is disputed by counter affidavits, depositions or documents. Yudin v. Carroll, D.C., 57 F.Supp. 793, Gallup v. Caldwell, 3 Cir., 120 F.2d 90, Rossiter v. Vogel, 2 Cir., 134 F.2d 908, Carroll v. Morrison Hotel Corporation, 7 Cir., 149 F.2d 404, each contains language holding in effect that where a triable issue of fact is presented on a motion to dismiss, the motion will not be granted.

At the conclusion of the hearing on the motion to dismiss, the Judge stated:

"I * * * will hold this court has jurisdiction and let you try the case, and, if you can clear up these things you may show them to the court, but I am going to deny this motion on the showing made here."

    *      *      *      *      *      *

"I am holding that those two established facts appear for the present and that the case should be heard."

We therefore interpret the ruling of the Judge who heard the motion as holding, merely, that the matters presented at the hearing convinced him that no sufficient showing had been made by the defendants, after consideration of the affidavits of the parties, to warrant the granting of their motion; that venue appeared "for the present", and that the case should be tried, and defendants might have the opportunity to "clear up" such matters at the trial.

We shall first consider the issue raised by the defendant not only in its motion to dismiss, but also in its answer, that this Court lacks jurisdiction in the premises, in that the suit was brought in the Southern District of California wherein, the defendant alleges, it is not an inhabitant, and has no regular and established place of business, and has committed no infringing act. (See 28 U.S.C.A. § 109).

It is conceded that defendant is not an inhabitant of this District, it having been incorporated in New York, and having its principal place of business in Brooklyn, of that State.

The evidence is sufficient to show that defendant has a regular and established place of business in this District, to-wit, in Los Angeles, California. (See Urquhart v. American, etc., 79 U.S.App.D.C. 219, 144 F.2d 542, certiorari denied 323 U.S. 783, 65 S.Ct. 273, 89 L.Ed. 625).

As stated by defendant's counsel in their brief filed October 24, 1946, the defense of inproper venue is based primarily upon the contention that defendant has committed no act of infringement within this District. We therefore shall scrutinize the evidence to ascertain whether defendant has manufactured, used, or sold within this District the machine manufactured by defendant

in New York, the assembly front mechanism of which is admitted by defendant to carry the part which plaintiff describes in his complaint as constituting an infringement of his patent.

## Manufacture

Plaintiff in his briefs and argument makes no contention that defendant has ever manufactured its linotype in this District, but insists that a sale of the machine in this District has occurred.

## Sale

Plaintiff introduced no direct evidence of any sale in this District beyond his statement that a newspaper publisher in Arcadia owns one of said machines.

In said depositions, George W. Allison and Harry L. Gage, Vice-Presidents of the defendant corporation, testified in detail as to the practice of the defendant in conducting its business throughout the United States; Mr. Gage testified specifically concerning the method used in the State of California, particularly in the County of Los Angeles, and stated the circumstances surrounding the sale to the Arcadia newspaper. The testimony of these officers on behalf of the defendant appears consistent, and is uncontradicted, and from their depositions it appears:

The Brooklyn, New York, office is the home office of the defendant, and it has sales offices in Boston, New York, Chicago, New Orleans, San Francisco, and Los Angeles. The same sales procedure is used by defendant throughout the United States in all its sales offices. Defendant is qualified to do business as a foreign corporation in California, and has designated an agent for service of process upon the Company, the agent being located in San Francisco, in the Northern District. The San Francisco office houses the Pacific Coast agency, which includes this District, and in said office, there are maintained the necessary files, records and stocks of printed literature to operate the sales promotional activities throughout the Pacific Coast area; a well balanced stock of repair parts and frequently needed accessories is maintained in San Francisco, and the sales activities for the Pacific Coast are directed by the office in such city. The Los Angeles office is in charge of a sales manager under whom are three salesmen, two office assistants and usually two machinists, and is located in a building which was especially erected for the Company on a leased basis and which was, at the time of its opening, advertised as the "new Los Angeles building" of the Mergenthaler Company. It was originally planned that all repair parts for the Southern District of California should be kept in San Francisco and shipped to Los Angeles upon request; the Los Angeles office carries only a small stock of repair parts for emergencies, and does not carry, and has never carried, supply parts which have any reference to the assembly front mechanism, which is the part of defendant's machine involved in this suit.

The Los Angeles office reports to the San Francisco office which in turn reports to the head office in Brooklyn. The Los Angeles office is not, and has never been, authorized to accept orders, though the San Franciso office was at one time, because of its distance from Brooklyn, so authorized, but this practice has been discontinued. With this one exception, orders are now and have always been, transmitted from the branch offices to the executive offices at Brooklyn. There, unless the sale is for cash, the financial aspect of the sale is scrutinized by the treasurer's office. Next, the order is reviewed as to the general relationship of the machine ordered to the printing plant in question; this is done by the executive sales department. Assuming the approval is given by these two departments, a preliminary contract form is signed by a vice-president in charge of sales. Next, the order is reviewed with regard to the legal aspects of the sales contract, and if it is found acceptable, it is then signed by an assistant-secretary of the company, and is regarded as a sale when the preliminary contract has been signed by a vice-president and an assistant-secretary. The customer is then notified of the acceptance of the contract, and a properly executed copy of the sales agreement is sent to him for his records. It is customary that the financial arrangement becomes effective when the customer is notified the machine is ready for shipment.

The factory keeps on hand basic models which it builds, and the order is next sent

to the factory accompanied by detailed specifications necessary for the particular customer. These may cover upwards of 100 basic modifications, and the matrix specifications may call for an almost unlimited number of combinations of some 2,000 different sizes and kinds of type. From the time the order is given to the factory, and the basic model is withdrawn from stock, the machine is custom built to conform to the requirements of the purchaser. The machine is then tested and when it has passed the chief inspector, it is transferred to the traffic department. At this point, the machine cannot be packed for shipment until the executive offices, through the machine release department, have confirmed the final sale of the machine through the customer's completion of the transaction. If the sale is made for cash, the contract may call for payment within a certain period after the machine has been delivered and erected on the customer's floor. If the sale is based on time payments, the usual notes and mortgages must have been executed.

When the machine is shipped, various methods may be used, depending upon the distance, as well as the conditions at the customer's plant, such as narrow doorways or elevators which may require the complete disassembling of the machine before shipment, or which may permit shipment in a partially assembled condition; it is only on a rare occasion that the machine can be shipped fully erected. Occasionally a machine may be shipped to the company's agency and assembled, then delivered fully erected to the customer. In most cases, the machine is delivered to the customer's plant in its original packing case, then erected by a linotype maintenance engineer who works out of a sales office in that neighborhood. The erection of the machine in the customer's plant is a part of the sales price of the machine. Having erected the machine and tested it, the engineer fills out an erection report which is verified by the mechanical executive of the purchaser, and this report is then sent to the district office, then to the agency headquarters; then to the executive offices at Brooklyn.

The terms of shipment throughout the country, with the exception of the Pacific Coast area, are f.o.b. Brooklyn. On the Pacific Coast, the contracts are written on the basis f.o.b. Los Angeles or San Francisco partly because it has been found more convenient to embody an average of freight rates to these points in the price, and partly because of general business custom on the Coast.

If the purchase is for cash, the payment is made at the offices in Brooklyn. If the transaction is covered by time payments, they are usually embodied in the form of notes, which clear through the office at Brooklyn and are usually presented to the customer through his local bank. In most cases the bill of sale is issued after the machine is erected upon the premises of the purchaser.

All order forms signed by customers bear a notation that the agreement shall become binding on the parties only upon acceptance in New York and by signature of the authorized officers with the seal of the company attached.

Mr. Gage further testified that from 1937 to the time of taking his deposition, about seventeen of the alleged infringing models had been sold in the Southern California District. That it is the practice of the company, under normal conditions, to keep its machines on display in its branch offices; in 1937, on the occasion of the opening of the new building which housed the Los Angeles office, one of the alleged infringing machines, fully equipped, was erected in that office for the purposes of demonstration. At the time of taking his deposition, the witness stated no machines were on display in the different branches throughout the country.

After testifying concerning the general course of business of the defendant, Mr. Gage referred to the one sale about which there is specific evidence, the sale to the Arcadia newspaper. His statement with reference to this sale, most of which was drawn from the company's records, was in effect, as follows:

"The order for a model 30 Linotype (an alleged infringing model) was signed by Mr. F. Harold Roach for the Arcadia Tribune and News on April 27, 1944. This order was accepted by our managing agent,

Mr. H. W. Porte at San Francisco on behalf of the Mergenthaler Linotype Company on May 3, 1944. On June 6, 1944, the War Production Board approved our customer's application for permission to install this machine, and the order was duly placed in process at the factory. On November 3, 1944, the factory at Brooklyn shipped Model 30, No. 56437, to our offices at Los Angeles. On November 14, 1944, the executive offices at Brooklyn sent the necessary papers to cover a deferred payment transaction. On November 29, 1944, the machine order department at Brooklyn acknowledged receipt of the necessary signed notes and mortgage, and found that the latter needed further attention of a Notary Public. On December 11, 1944, the machine order department acknowledged receipt of two copies of the mortgage properly executed, and sent to the customer a bill of sale conveying title to the machine to the Arcadia Tribune and News.

"On December 30, 1944, the machine was trucked from our Los Angeles offices to Arcadia; and on January 15, 1945, our maintenance engineer sent in his regular erection report indicating that the erection of the new model 30 was complete. Title passed to the machine when our bill of sale was mailed to the customer on December 11, 1944."

No other evidence concerning the circumstances of this sale appears in the record.

■ The plaintiff, while maintaining that the defendant has engaged in a transaction which constitutes a sale in this District, has cited no cases which purport to support his contention. Rather, his counsel in his argument states that defendant's method of doing business is a "farce and a fraud, and no doubt was instituted for the sole purpose of escaping possible suit in the state where it does business." We are of the opinion that counsel in his reasoning has confused the conditions necessary to constitute a "regular and established place of business" with the requirements necessary to constitute an infringing act. Proper venue requires that both these elements must exist, but they are separable, and the presence of one element does not of necessity connote the appearance of the other.

The absence of either is fatal. (Endrezze v. Dorr Co., 9 Cir., 97 F.2d 46; Phillips v. Baker, 9 Cir., 121 F.2d 752.)

The facts concerning the sale in Arcadia afford the only specific evidence before us from which we may ascertain whether a sale was made in this District; as in Endrezze v. Dorr Co., 9 Cir., 97 F.2d 46, the machine sold was in many respects "custom made" out of the District to suit the requirements of the customer, and the order, though solicited in the District, was accepted out of the District, and no one in the District had authority to complete the sale; indeed, the many factors which entered into the company's acceptance and completion of the order negative any implication that the sale could have been completed in the District. Though in the case before us, the machine was delivered by the Company to its agent here, and by such agent delivered to the customer, the facts show that the financial arrangements were completed in New York, the bill of sale came from New York, and title passed before the machine was delivered to the customer. The sale was therefore consummated in New York.

■ In New Wrinkle v. Fritz, D.C., 30 F.Supp. 89, the Court stated (page 91): "There can be infringement only by the making, selling or using of the infringing product. Sale means the making of the agreement binding the parties. That agreement was made in Pontiac. The sale was consummated there. The place of consummation is controlling. Westinghouse Electric Mfg. Co. v. Stanley Electric Mfg. Co., C.C. 116 F. 641."

■ We conclude that the evidence establishes no sale within the District.

### Use

In Scott & Williams, Inc. v. Hemphill Co., D.C., 14 F.Supp. 621, the Court held that plaintiff had a regular and established place of business in the district where suit was brought, and in addition stated as follows on page 622:

"Among the machines kept at the New York office is a machine for knitting stockings, of the type claimed to infringe the plaintiff's patent. The machine is

operated with a fair degree of continuity, to demonstrate its advantages to prospective buyers, the stockings made on it being distributed as samples. So far as appears, this is the only infringing machine within this district. The foregoing is a fair summary of the defendant's local activities.

"First, as to acts of infringement within the district. The alleged infringing machine is neither manufactured nor sold here, but it strikes me that it is used here sufficiently to constitute infringement. One of the machines is operated here, both as a demonstration to convince buyers of its merit and as a way of making sample stockings to send out to the trade. This is a 'use' of the machine. It is much more than a mere exhibition of an alleged infringing article, which was held in Hoegger v. F. H. Lawson & Co., D.C., 35 F.2d 219, not to amount to an act of infringement."

In Patent Tube Corporation v. Bristol-Myers Co., D.C., 25 F.Supp. 776, the District Court cited with approval the case of Scott & Williams, Inc., v. Hemphill Co., D.C., 14 F.Supp. 621, and held as follows: (page 777 of 25 F.Supp.)

"The defendant admits having sent some containers allegedly containing the patented device through the mails from New Jersey to several physicians and dentists within the Southern District of New York. It also admits that some of its salesmen may have carried some of the containers in this District in their pockets and have distributed them to physicians and dentists. This it is claimed, is done solely as an advertisement feature of its business and was not distributed for sale or any other monetary compensation.

"The defendant takes the position that these instances are merely nominal uses of the patented device, whereas the statute contemplates a substantial use before the court will entertain jurisdiction of a patent suit.

"While no authorities have been submitted directly in point, nor has the court independently been able to discover any, the court is of the belief that it should entertain jurisdiction. The distribution of the patented device only for advertising purposes and without actual monetary compensation therefor, in my opinion, creates no exception to the general rule that use of the patented device is forbidden. To hold so would be permitting the doing of something indirectly which is forbidden to be done directly. It is common knowledge that advertisement is an important medium for the obtaining of business. Therefore, what appears to be an innocuous use of a patented device becomes at some point a substantial source of business."

The Court then held that the facts above quoted constituted a use.

In the instant case we have no evidence that the alleged infringing machine was ever demonstrated in this District. True, one of defendant's vice-presidents testified that one or more of the machines was at one time present in the Los Angeles office "for demonstration purposes," but there is no testimony as to whether the machine was demonstrated in this District, or, assuming it was, whether the demonstration was sufficient to constitute a use within the holding of either of the two last cited cases.

We have found no cases which hold the mere display of the infringing article constitutes an act of infringement.

In Hoegger v. F. H. Lawson & Co., D.C., 35 F.2d 219, 222, a single shopworn sample was sold. The evidence also disclosed that samples were displayed by defendant's agent at his office within the District. While the decision of the Court was concerned mainly with whether there had been a sale, or whether there was a regular and established place of business, in the district, the Court made the comment, after reviewing the evidence, and holding the single sale of the sample did not disclose an act of infringement: "I am also inclined to think that no other act of defendant within this district disclosed by the evidence shows infringement."

In American Electric W. Co. v. LaLance & Grosjean Mfg. Co., D.C., 256 F. 34, the defendant manufactured its goods in New York, and before 1915, it maintained a Boston branch, wherein it kept a supply of its goods for sale which presumably in-

cluded goods embodying the patented invention. In 1915, defendant discontinued this branch office, and employed a salesman who took orders and forwarded them to the home office for acceptance; the bills were sent from New York, and remittances were made from the customer to the New York office. Samples of the goods were kept for display in the Boston office. A single purported sale was procured through the secretary in the office in Boston wherein at the insistence of an agent of the plaintiff the secretary accepted the money for an article which was shipped from the home office in New York. The Court, after reviewing the facts summarized above, held the purported sale did not constitute infringement, and further ruled that the course of business shown by the evidence did not disclose an infringement committed by the defendant in the Massachusetts district where suit was brought.

In Maw v. Northern Pump Co., D.C., 27 F.Supp. 808, it was admitted on a motion to quash summons that a few samples were kept in the New York office of defendant, which samples were of the type alleged to infringe plaintiff's patent. The Court ruled that this did not indicate an act of infringement. .

■ Therefore, we find no evidence in the case before us to establish a use of the alleged infringing article in this District.

■ While we conclude that this case should be dismissed for lack of jurisdiction because of improper venue, counsel have requested that we also make a finding on the issue of laches.

At the trial, the testimony of plaintiff established that he had full knowledge in the year 1937 of the facts which he alleged constituted infringement; that on March 22, 1937, he wrote defendant, notifying it that the machine it was then advertising and putting on the market infringed his patent. That under date of June 30, 1937, he received a letter from defendant's counsel wherein such counsel stated: "Under the circumstances, there is nothing left for us to do except to advise our client, as we are doing, that there is no merit in your charge of infringement and that it may safely be ignored."

Plaintiff further testified that he had no feeling that an amicable settlement would be made with him by the defendant; that he had other cases pending and that he was doing all he needed to do if he notified the defendant of infringement; that he let things drift along as long as he felt he was safe to do it; that as a result of his previous dealings with the defendant, and of his study of court decisions pertaining to laches, plaintiff felt he was perfectly safe in taking all the time he wished to bring this action; that there came a time when it was "now or never" as the patent was about to expire, and plaintiff testified he "tried to do something about it."

The evidence shows that from June 30, 1937 until 1945, plaintiff did not communicate with defendant in any way, and heard nothing from defendant; that plaintiff did not consult an attorney about the matter until in 1945. That in 1945 plaintiff decided to go ahead with the suit, and just prior to filing suit, another letter was written to defendant charging infringement.

The evidence of defendant shows that between March, 1937, and the filing of the suit defendant expended large sums of money for advertising and promotion of models which included the alleged infringing device; that it required about a year to "tool-up" for two of the models; that this work was not completed until sometime in 1938, and only 25% of it had been done as of March 31, 1937; the cost of this tooling-up was about $400,000; between 1938 and 1943, these models were re-designed and changes made, these processes including considerable research and development and re-tooling, at a cost running into about $125,000; during the year 1941 defendant put on the market two other models which included the alleged infringing structure; to the date of trial, the cost of tooling up for these models amounted to $50,000, which figure did not represent the total cost; also that considerable sums had been spent on advertising these two later models. Defendant's officers further testified that when no action was taken by plaintiff in 1937, defendant assumed that plaintiff had been legally advised that his charge was of no merit, or that the correspondence of defendant's counsel had

produced such a conviction in the mind of plaintiff.

The patent herein involved was issued July 31, 1928 and expired July 31, 1945, this suit having been commenced approximately two months prior to said expiration date.

The evidence establishes that for more than eight years plaintiff had full knowledge of the use by defendant of the alleged infringing structure; that more than eight years ago plaintiff became convinced that relief against said alleged infringement could be obtained only by suit, yet plaintiff has failed to introduce any testimony justifying such delay in bringing suit. Defendant has shown by competent testimony that it was informed by counsel that it had not and was not infringing plaintiff's patent, and that its counsel transmitted such information to plaintiff; that thereafter, defendant, relying upon the inactivity of plaintiff, expended hundreds of thousands of dollars in developing, advertising and manufacturing the product using the alleged infringing structure.

In Gillons v. Shell Co. of California, 9 Cir., 86 F.2d 600, Judge Garrecht of our Ninth Circuit, in reviewing the facts of that case, noted that the plaintiff became convinced of the acts of infringement on the part of the defendant in 1920, or 1921, yet did not bring suit until 1930. There Judge Garrecht stated (pages 608, 609).: "When the suit is filed after the statutory period, injury is presumed. * * * Equity frowns upon stale demands. She will not aid one who has slept upon his rights. She turns her back upon a litigant who has been guilty of unreasonable delay in filing suit. * * * In connection with the bar of laches, from the earliest days federal courts have emphasized the distinction between a reasonable and an unreasonable delay in bringing suit—even within the period designated by the statute of limitations."

In Window Glass Machine Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645, certiorari denied 261 U.S. 623, 43 S.Ct. 518, 67 L.Ed. 832, a case also cited by Judge Garrecht in the Gillons case supra, Circuit Court Judge Woodley remarked (page 650 of 284 F.): "This defense is based on a well-settled principle of law. In its applica-

tion courts recognize the general rule that, in a case of this kind, mere delay, unaccompanied by anything else, will not ordinarily bar a suit for injunction against a naked infringer. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; Prince's Metallic Paint Co. v. Prince Mfg. Co., [3 Cir.,] 57 F. 938, 6 C.C.A. 647, infra. But they also recognize a distinction between mere delay and unreasonable delay, where in the latter is involved the element of lack of diligence and the consequent inequity, under the circumstances, of permitting the claim to be enforced."

The facts in Westco-Chippewa Pump Co. v. Delaware Electric Supply Co., et al., 3 Cir., 64 F.2d 185, are somewhat analogous to those in the case before us. There the plaintiff knew defendant had been actively manufacturing its pump since December, 1921, and in 1925 and 1926 conferences were had between the attorneys for the parties, wherein it was suggested by plaintiff that defendants take out a license under plaintiff's patent, and defendants refused. Nothing was actually done to stop the infringement, and there was no change in the attitude of the parties as to their rights until July 9, 1929, when the suit was brought. In rendering the opinion of the Circuit Court, Judge Davis observed (page 187):

"The evidence does not disclose any excuse justifying this long delay. No case is an exact precedent for another because the facts in no two cases are exactly alike, but a uniform principle runs through all the cases. They proceed on the theory that the plaintiff knows his rights and has had ample opportunity to establish them in the proper forum; that, because of delay, the defendant has good reason to think that the plaintiff believes his asserted rights to be worthless or that he has abandoned them. Galliher v. Cadwell, 145 U.S. 368, 372, 12 S.Ct. 873, 36 L.Ed. 738. The position of the defendant is further fortified in this case by the opinion of reputable counsel. It could well assume that plaintiff's counsel had reached the same conclusion as its own. McGill v. Whitehead & Hoag Co., C.C., 137 F. 97; Yates v. Smith, D.C., 271 F. 27.

434

"The question of laches then assumes the aspect of the plaintiff having stood by and having done nothing to protect its rights for seven years while the defendant was building up a business, which it thought was legitimate, and spending money in constructing a large plant.

"We cannot say that the learned trial judge erred when he found from the evidence that plaintiff had not been diligent in asserting and enforcing its rights."

█ It thus appears that plaintiff is barred by laches from maintaining this suit, and we so conclude.